Neil **ROGEN**, Plaintiff, Appellant,

v.

**ILIKON CORPORATION** et al., Defendants, Appellees.

No. 6692.

United States Court of Appeals First Circuit.

June 2, 1966.

---

Robert J. Hallisey, Boston, Mass., and Louis Loss, Cambridge, Mass., with whom Richard M. Harter and Bingham, Dana & Gould, Boston, Mass., were on brief, for appellant.

Robert W. Meserve, Boston, Mass., with whom Alan R. Trustman, Laurence M. Johnson and Nutter, McClennen & Fish, Boston, Mass., were on brief, for appellee.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

## OPINION OF THE COURT.

COFFIN, Circuit Judge.

This appeal tests the propriety of the district court's action in granting defendant's motion for summary judgment in a suit brought to recover damages for non-disclosure of material facts in connection with the sale of plaintiff's stock to defendant corporation. The pertinent section of the Securities Exchange Act of 1934, 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder, are set forth in the margin.[1]

---

1. Section 10(b) provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\*  \*  \*  \*  \*  \*  \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the

Defendant corporation (Ilikon) was organized in 1960 by several doctoral candidates at the Massachusetts Institute of Technology (plaintiff and defendants Bonis and Sandven), and a business associate of the underwriter, defendant Wong. They were soon joined as both directors and stockholders by defendants Scott and Ansell. The purpose of the corporation was to do research and development work in materials engineering and science. Plaintiff had earlier formed an engineering and consulting firm which became a subsidiary of Ilikon. He was the key insider in Ilikon's promotion, and became president, secretary, and its largest single stockholder.[2]

Plaintiff had conceived the idea of developing products of aluminum by blowing gas under pressure through a nozzle submerged in molten aluminum, producing aluminum bubbles. Work on developing this concept was turned over to Ilikon where a metallurgist consultant, Dr. Witt, working immediately under defendant Bonis and under plaintiff's general supervision, proceeded to adapt the general concept and work toward the production of an aluminum container suitable for commercial exploitation.

Experimentation went forward with molds of various materials, sizes, and shapes, different mixtures and pressures of gases, different alloys, temperatures, refinement of the nozzle, and a machine to lower and raise dies. By June 1961, an aluminum can had been "blown" with the use of hand-operated machinery.

Subsequently monthly progress reports were made for July, September, October, November, and December. The December report outlined the work for January 1962, which included putting together or "mating" the parts of the mechanized system. At this point the reports were terminated, apparently because of the consultant's dislike for excessive paper work.

On October 25, 1961, plaintiff wrote a sales letter to Reynolds Metals Company stating that Ilikon had developed a feasible method of fabricating aluminum cans and that it was time to consider commercial use. After an interim acknowledgement, the Reynolds Product Development Director replied, saying that Reynolds was "always happy to hear from people who are interested in aluminum and our company" and enclosing a form for Ilikon to fill out, which would release Reynolds from liability in connection with its use of any idea submitted. On receiving this letter, plaintiff took no further action.

Meanwhile, defendants and other Ilikon personnel were becoming dissatisfied with plaintiff's performance. Several extended absences, a progressive shortening of plaintiff's working day, an embarrassing consultation with a client, and disproportionate stock ownership were cited as specific reasons. An informal meeting was held to discuss the problem. A day later, January 19, 1962, the board dismissed plaintiff as president and secretary, and terminated his employment as of February 28. Defendant Bonis was elected president. Defendant Scott proposed that plaintiff sell 30,000 of his shares for $30,000 to help the company obtain needed financing, which offer plaintiff refused. The meeting adjourned, plaintiff and his father remaining as directors.

Plaintiff ultimately agreed to sell his stock in a document executed on April

statements made, in the light of the circumstances under which they were made, not misleading, or
   (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

2. Of 350,000 shares outstanding at the time of the action complained of, plaintiff owned 52,700 shares; his father, 7,100 shares; the public, 75,000 shares; and the remaining 215,200 shares were divided among defendants Scott, Wong, Bonis, and Sandven. Friends of plaintiff and his father owned approximately 27,500 shares.

4, 1962.[3] The period of alleged misrepresentation and nondisclosure of facts material to such sale is that between January 19 and April 4. The areas of defendants' conduct complained of by plaintiff are three: nondisclosure of the reviving of Ilikon's negotiations with Reynolds; nondisclosure of the continuing technological progress on the aluminum can project; and defendants' allegedly false representations as to the market, made to depress the price plaintiff sought for his stock. The defendants, in addition to denying any material representation and the materiality of any nondisclosure, claim that the plaintiff, by his action and non-action in this period, conclusively demonstrated that he did not rely on any representations or lack of disclosure on the part of defendants.

### Reynolds Negotiations

Five days after the directors' meeting discharging plaintiff, defendant Bonis, having discovered the exchange of correspondence between plaintiff and Reynolds, wrote Reynolds, enclosing the requested release. This led to a meeting in late February and an expression of interest by Reynolds in exploring outright purchase of Ilikon's rights, an exclusive license, and joint development by the two corporations.

A special meeting of Ilikon's board of directors was held on March 2, of which plaintiff had notice, but which he did not attend. Defendant Bonis reported to this meeting his discussions with Reynolds as to possible purchase, license, or joint development.

On March 8, Reynolds wrote Ilikon requesting specific proposals for sale, license, and joint development. This news was conveyed by letter from Bonis to Ilikon's directors with the admonition to treat it confidentially. A second meeting with Reynolds took place on March 23. Defendant Bonis had prepared an exclusive license proposal for which Reynolds would pay an initial license fee of $100,000, and minimum royalties reaching $1,000,000 a year in the fourth year. This was not shown to Reynolds but the general terms were discussed without reference to amounts. Subsequent meetings, correspondence, and telephone conversations followed until July 11,[4] when Reynolds, insisting on a permanently exclusive license, unacceptable to Ilikon, terminated the negotiations.

Plaintiff did not learn about any of these negotiations until some time after he signed the agreement of sale on April 4. On April 26 counsel for Ilikon, in response to a question from plaintiff's counsel as to rumors of Ilikon-Reynolds negotiations, confirmed the fact but said they were in a very preliminary stage. He agreed to keep plaintiff's counsel informed.

At some point after August 27, the closing date for completion of the transfer of plaintiff's stock, Ilikon made an approach to American Can Company and in December executed a license agreement with it, which is still operative, although commercial production has not yet been reached.

### Technological Progress

The evidence of technological progress by Ilikon between January 19 and April 4 is as follows. Defendant Bonis testified to improving quality and control, with mechanization enabling the die to be lowered and raised and the nozzle to be centered more accurately. He said that the feasibility of the technique was observed by Reynolds in February and that there was some additional improvement before the March meeting. He admitted that some improvements were in-

---

3. The contract document bore the date of March 26, but the actual signing took place on April 4.

4. Between January 19 and April 4, there were some eleven letters, six telephone calls, two internal meetings at Ilikon and two inter-company conferences between Reynolds and Ilikon. Between April 4 and July 11 there were three meetings between representatives of the two companies (two of them in Richmond, Virginia), twelve letters, eleven telephone calls, two Ilikon meetings, and three or four drafts of a tentative agreement.

corporated in a second patent application prepared on March 22. But he did not feel that any technical advances in the spring of 1962 were "substantial".

Ilikon's consultant, Witt, also felt that the advances made after June of 1961 were solutions of engineering problems rather than research. Ilikon's patent attorney said in an affidavit that one of his associates, who had started to revise the patent application in the fall of 1961, finally was able to visit Witt at Ilikon on March 22 to complete it, and that had there been any material developments in the interim he would have known of them.

On the other hand, the revised patent application reveals a substantially different mixture of gases. An affidavit of a metallurgist, offered as expert opinion by plaintiff, set forth the importance of "a very large number of engineering details" to "economic feasibility and the realization of automated commercial reproduction". The affidavit, after asserting that in research of this type "often some factor, believed to be of minor significance, turns out to be critical", concluded that the development of an automated or semi-automated machine and the discovery of the optimum ratio of oxygen to hydrogen constituted "substantial and material" developments and "would be of considerable interest and importance to any one trained in metallurgy and familiar with the goal of this project". Plaintiff testified that consultant Witt had told him that the automatic machine, together with the "new gas", developed since plaintiff left Ilikon, was responsible for the "improved cans" and the "great interest" that was displayed by Reynolds.

Plaintiff had not seen machinery used on the project since September or October of 1961. His last progress report was given to him orally by defendant Bonis in December. Between January 19 and April 4 he talked to no person associated with Ilikon concerning the progress of work. In an affidavit opposing summary judgment, he stated that, in December and January, he had asked about the machine and was told that it was awaiting parts and was not operating.

### Representations About Stock

The facts as to the negotiations leading up to plaintiff's agreement to sell his stock may be summarized as follows. After the directors' meeting of January 19, plaintiff obtained counsel who sought and received a "no-action" letter from the Securities and Exchange Commission. This gave plaintiff some assurance that he could safely proceed to sell his stock without registration. He began selling some shares on the open market. The bid price for Ilikon's stock fell from $11 per share on January 23 to $6 on March 16.[5]

Ilikon's board, as noted above, met on March 2 and discussed the threat to the market price of its stock posed by plaintiff's "no-action" letter and the impact of possible large scale selling by plaintiff on its future financing. After reviewing the hazards of unrestricted transfer, the dangers of trying to impede transfer, and the disadvantages of trying to buy plaintiff's stock at an inflated price, the directors voted to order the transfer agent to stop transfers of plaintiff's stock.

On or about March 5, plaintiff visited a partner in the firm which had been the underwriter for Ilikon's original public issue (and, according to Ilikon's prospectus, an associate of defendant Wong). He advised plaintiff that if he persisted in trying to sell his block of stock, the market would disappear. He suggested orderly secondary distribution through his firm. Plaintiff refused.

Soon after this, on March 15 or 16, defendants Wong and Scott met with plaintiff and his counsel. Wong said that any effort by plaintiff to sell his and his father's stock would cause the market to fall. Plaintiff replied that

5. By March 26 it had risen to 13½; on April 4 the bid price was 12½; by the end of April, 19½; and by May 11, it had reached 28½.

he had no intention of doing this and depress the value of his own stock. Wong offered a price of $4 a share, but plaintiff held to his price of $8.50.

Immediately after this meeting, plaintiff and his lawyer saw the underwriter, who had just come from lunch with defendants Wong and Scott. Plaintiff wanted to inquire if the underwriter would underwrite the sale of his stock. The underwriter spoke of the thinness of the market and advised plaintiff to accept any offer defendants might make and "run like a deer". After this, plaintiff had some telephone conversations with defendant Scott and agreed on a selling price for his stock of $5.43 a share. This oral agreement ripened into the contract signed on April 4.

Plaintiff freely acknowledged that he had not been influenced by defendant Wong's talk, but was influenced by his own impression of the thinness of the market for Ilikon stock. After the agreement was executed, however, he learned that, in April, 7,500 shares of stock of one outside stockholder had been sold in two days and 15,000 shares of another had been marketed within a week.

### The Contract

The written agreement provided for the sale of 55,200 shares belonging to plaintiff and his father for a total price of $300,000, with the balance of 4,900 to be sold at a rate not exceeding 400 shares in any period of 30 days. Provision was made for deposit of the stock with an escrow agent, delivery of Ilikon's initial check for $50,000 to be made on receipt by the escrow agent of all stock certificates and stock transfer powers. Plaintiff, his father, and defendants joined in mutual releases of all claims including those related to employment, the termination thereof, and the transfer and sale of stock. Plaintiff and his father also acknowledged "that they are fully familiar with the business and prospects of the corporation, are not relying on any representations or obligations to make full disclosure with respect thereto, and have made such investiga-

tion thereof as they deem necessary". As an "inducement" to plaintiff and his father, the contract contained a provision signed by defendants Scott and Wong giving their personal guarantee of payment to plaintiff notwithstanding bankruptcy or insolvency, etc., of Ilikon. At the time of signing, plaintiff did not make inquiry of progress within the company for the reason, he stated, that he thought it would be "fruitless".

On May 11, plaintiff demanded rescission. This was rejected on the following day by defendants. The contract was executed, with stock delivered on the closing date, August 27, plaintiff stating that he was reserving his rights "arising out of said agreement or the circumstances leading to the execution thereof".

The complaint was filed in September 1962. 1963 was occupied with depositions and a motion to produce documents. In 1964 the only progress in the suit was the filing of defendants' motion for summary judgment and a second motion by plaintiff for production of documents. 1965 passed with the taking and filing of several depositions and the filing of affidavits. In 1966, summary judgment was allowed and this appeal taken.

Because this comes to us on summary judgment, where facts and implications must be painstakingly assessed, we have felt obliged to treat the facts rather fully. We have tried to piece together the three depositions, nine affidavits, eight exhibits, and one set of admissions to make a cohesive whole. In doing so we have been handicapped by the partitioning of testimony and documents by both sides in their printed records, by occasional omissions of points of reference, and generally by the absence of cross-examination of affiants or evidence from some possibly key participants.

We doubt that a case such as this is ordinarily well adapted to disposition on summary judgment procedure. The delicate field of fiduciary relationships where the import of non-action must be assessed in the light of surrounding circumstances may well indicate a preference for the antennae of the fact

finder over the cruder instrument of summary judgment. In any event, a period of almost four years is hardly "summary". Nevertheless, we reverse reluctantly. We are cognizant at the time and effort invested by the parties, counsel, and the court. We are impressed by the marshalling of facts and argument in the district court's opinion. But the standard of review is a rigorous one and not even one chink in the armor of decision can be vulnerable to the question: taking the facts and inferences most favorable to the losing party, would a trier of fact nevertheless have to find against him? [6]

The two grounds for opinion below were that there was not, on the evidence most favorable to plaintiff, any nondisclosure or misrepresentation of material fact; [7] and that there was no reliance by him on any nondisclosure.

As to the first ground, we bear in mind that if a trier of fact could rationally find for plaintiff on one of the three asserted issues, plaintiff should have his day in court on material nondisclosure, unless it is clear, as a matter of law, that there was no reliance on such nondisclosure.

■ The district court properly set forth the standard to be applied, namely, whether "a reasonable man would attach importance [to the fact not disclosed] in determining his choice of action in the transaction in question." Restatement, Torts § 538(2) (a). It correctly observed that this standard applies in 10b–5 situations, citing List v. Fashion Park, Inc., 2 Cir., 1965, 340 F.2d 457, cert. denied sub nom. List v. Lerner, 381 U.S. 908, 85

S.Ct. 1536, 14 L.Ed.2d 432, and Kohler v. Kohler Co., 7 Cir., 1963, 319 F.2d 634, both of which cases describe as "material" those facts about a corporation's business "which in reasonable and objective contemplation might affect the value of the corporation's stock or securities * * *" 340 F.2d at 462; 319 F.2d at 642.

■ Phrasing the Reynolds negotiations issue as favorably to the plaintiff as is permitted, we pose these questions: Would a reasonable man, until recently intimately associated with the affairs of Ilikon, be impressed by the reactivation of interest in Reynolds to the extent that it was willing to come to Ilikon and even to ask for proposals for outright purchase, exclusive license, or joint development? Regardless of the final outcome, would such a person be moved to elevate his views as to the value of his stock by deliberations which caused his former colleagues to think in terms of an annual royalty of a million dollars a year? Even with the possibility of the collapse of negotiations, could not a trier of fact find that the former key founder of the corporation, put off by a diffident reply from Reynolds, would take heart from the fact that a large company had seen enough merit in Ilikon's process to ask for concrete proposals? We think it is possible that a trier of fact could answer "yes" to these questions. We also think it is possible that a negative answer could be given as in List v. Fashion Park, Inc., supra, and James Blackstone Memorial Library Assn. v. Gulf Mobile and Ohio

6. We can do no better than to quote the language of United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176: "On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion. A study of the record in this light leads us to believe that inferences contrary to those drawn by the trial court might be permissible."

7. Specifically, the district court ruled "as a matter of law, that the Reynolds' ne-

gotiations were not material and there was no duty to disclose them to the plaintiff"; that there is "nothing in this record beyond the plaintiff's bare assertions that the use of the machine and new gas composition were significant break-throughs, to show that, in fact, they were anything more than the small advances toward reduction to commercial use of the idea that one would expect * * *"; and that the alleged misrepresentations of the state of the market were "clearly only expressions of opinion and admittedly so regarded by the plaintiff".

R. R. Co., 7 Cir., 1959, 264 F.2d 445. But it is one thing for a trier of fact to say "no" and another thing to say that a trier of fact could not say "yes".

As to technological progress, even though we might say that the weight of the evidence favors the conclusions of defendants' witnesses, there is an admitted conflict of opinion between the two sides. Not only the plaintiff but another metallurgist (admittedly not cross-examined) concluded that the improvements on the machine and gas mixture were "substantial and material" developments. A jury might even read more than coincidence into the visit to Ilikon of a patent lawyer to complete a second patent application the day before a meeting with Reynolds Metals Company. It might even take the facts as testified to by Bonis and Witt and reach a conclusion different from theirs. The test, after all, is what a reasonable person in plaintiff's position would think, if he knew about the developments.

Coming to the allegations of affirmative misrepresentation concerning the state of the market for Ilikon's stock, we find no genuine issue of material fact. We agree with the district court that the statements by defendant Wong were his opinion, which plaintiff disavowed accepting.

If we are correct in saying there were possible questions of fact concerning defendants' nondisclosure of negotiations with Reynolds and significant technological progress, the judgment of the district court should nevertheless be affirmed if it has been demonstrated as a matter of law that plaintiff in no way relied on such possible nondisclosure of material facts.

This is a much closer question, for the available evidence of non-reliance is impressive. Plaintiff had been—originally at least—closely involved with the development work on the aluminum can project. It had stemmed from his idea. He was able to assess the significance of the various steps taken. He had initiated the first contact with Reynolds. He did not try once to discuss the affairs of Ilikon after leaving its employ although he remained a director. He did not attend the March 2 directors' meeting and he resigned as director shortly thereafter. Neither plaintiff nor his counsel, in discussions looking toward the sale of his stock or at the signing of the agreement, sought to find out what was going on within Ilikon.[8] Plaintiff must have known that Ilikon's stock had doubled in market price by March 26. Finally, plaintiff signed an agreement in which he specifically acknowledged his full familiarity with "the business and prospects" of Ilikon, his non-reliance on any duty to disclose on the part of defendants, and his having made all necessary investigation.

This array of evidence might very well persuade a trier of fact that plaintiff was not injured by any nondisclosure on the part of defendants. But to say that non-reliance was established as a matter of law is to reject the possibility that a judge or jury could adopt the following reasoning: (1) that plaintiff, contrary to the situation in Kohler v. Kohler Co., supra, and List v. Fashion Park, Inc., supra, was not an experienced businessman but more akin to the plaintiff in Royal Air Properties, Inc. v. Smith, 9 Cir., 1964, 333 F.2d 568, 572—"negligent —perhaps grossly so * * * exceedingly gullible in that he was overtrusting, but this is understandable in view of the fact that his professional activities are wholly divorced from the world of business"; (2) that plaintiff might have viewed the cessation of monthly progress reports as an indication that nothing interesting was happening within Ilikon; (3) that plaintiff, having been accustomed to receiving progress reports on technical work from Bonis, lost his only access to such information when he left Ilikon and Bonis became president; (4) that plaintiff, when asked why he had not questioned Ilikon personnel, really be-

---

8. The key question asked by the plaintiff in Janigan v. Taylor, 1 Cir., 1965, 344 F.2d 781, cert. denied 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120.

lieved that "That would have been fruitless. Nobody would talk to me." (which statement, whether true or not, tends to rebut plaintiff's lack of non-reliance); (5) that, had plaintiff attended the March 2 directors' meeting, there might well not have been any open report from defendant Bonis or mention of negotiations with Reynolds; (6) that, having talked with directors Wong, Scott, and Bonis, and employee Rowe during the critical period, with no mention of internal progress or negotiations, plaintiff might be just as much misled that things were "about the same", as devoid of "promising overtones", as the plaintiff in Janigan v. Taylor, supra; (7) that plaintiff, knowing the company's low cash position, its need for additional financing being told by the underwriter (whose acquaintance with Ilikon and defendant Wong had been close) to take what he could get and "run like a deer", and, reading the "inducement" clause of the final agreement which undertook to protect him in the event of Ilikon's bankruptcy, might justifiably have assumed that prospects might even have taken a turn for the worse; and (8) that plaintiff, who stated that he "questioned" the non-reliance contract clause, may have signed it in an atmosphere of pessimism and anxiety not to jeopardize the contract of sale.

We do not say that such reasoning is persuasive to us or equals in weight the contrary arguments. All we hold is that there is enough possibility of a finding for plaintiff on the reliance issue to foreclose our finding non-reliance as a matter of law.

A separate comment should be directed to the contractual acknowledgement of non-reliance. We are not aware of other judicial treatment of such a provision. This is not, in its terms, a "condition, stipulation, or provision binding * * * [plaintiff] to waive compliance" with the Securities Act of 1934, as set forth in Section 29(a) of the Act, (15 U.S.C. § 78cc(a)). But, on analysis, we see no fundamental difference between saying, for example, "I waive any rights I might have because of your representations or obligations to make full disclosure" [9] and "I am not relying on your representations or obligations to make full disclosure." Were we to hold that the existence of this provision constituted the basis (or a substantial part of the basis) for finding non-reliance as a matter of law, we would have gone far toward eviscerating Section 29(a).

Defendants have a reasonable query: what is a company to do in circumstances such as these when delicate preliminary but serious negotiations are being conducted at a time when it is desirable to try to buy out a disaffected stockholder? The options seem to us to be: (1) to refuse to disclose and refrain from buying during negotiations;[10] (2) to disclose and attempt to buy during negotiations; and (3) if it clearly appears that the selling stockholder is in no way relying on nondisclosure, to take a chance on litigation as did the defendants in List, Kohler and Blackstone, supra. If these options seem inadequate, the basic answer is that the law has deliberately tried to equalize bargaining power between the individual and the corporation. The fact that during critical negotiations the scales may be weighted in favor of the departing stockholder is part of the price paid.

Defendants have argued, finally, that judgment should be affirmed because (a) the contract embraced a general settlement of claims between the parties and (b) plaintiff, having finally elected to abandon his claim for rescission and compel consummation of the agreement at the agreed closing date of August 27, 1962, must be bound by all parts of the agreement including the comprehensive releases.

The authorities cited to us do not support our finding release, waiver, or es-

---

9. Cf. the invalidated waiver language in Wilko v. Swan, 2 Cir., 1953, 201 F.2d 439, 442 n. 5.

10. The course urged before us by the Securities and Exchange Commission in an amicus curiae brief, citing Cady, Roberts & Co., 1961, 40 SEC 907, 914.

toppel as a matter of law. In Royal Air Properties, Inc. v. Smith, supra, where an investor was alleged to have retained his investment for two years after learning the complete facts, the court merely remanded the case for trial on the issues of waiver, estoppel, and laches. So also in Straley v. Universal Uranium & Milling Corp., 9 Cir., 1961, 289 F.2d 370, the court remanded for trial on issues of waiver and estoppel a case where plaintiff stockholders had taken no action for nearly 11 months (approaching the pertinent period of limitations) after learning of a violation of registration requirements.

Nor are we impressed with the argument that plaintiff by his "election" to go ahead with the agreement and transfer his stock thereby "adopted" the entire agreement, including the comprehensive releases. After execution of the agreement and discovery of the facts previously not disclosed, plaintiff had the choice of seeking rescission or completing the transfer called for by the contract and seeking damages. His demand for rescission was speedily resisted by defendants. Plaintiff served notice that by participating in the closing procedures, he was not thereby waiving any rights he had. Defendants' claim that the mutual releases nevertheless were adopted by completing the contract amount to saying that his only remedy was an action for rescission since plaintiff could not sue for damages except by passing title to his stock, but by taking such action plaintiff would be waiving all claims. There is here no question of condonation of any wrong or application of the doctrine *"Volenti non fit injuria"*.[11] Were the law to be as defendants suggest, a corporation could, by fixing a distant closing date in a contract of purchase, effectively insure itself for substantial periods against money claims for nondisclosure at the time of execution of the contract.

Judgment will be entered reversing the judgment of the District Court and remanding the action for further proceedings.

---

11. The Massachusetts cases cited by defendants, Geoffrion v. Lucier, 1957, 336 Mass. 532, 146 N.E.2d 654; Doujotos v. Leventhal, 1930, 271 Mass. 280, 171 N.E. 445, 69 A.L.R. 1080 are not contrary to this holding, for here too the contract was partially executed, with an escrow agent having taken delivery of stock from plaintiff and funds from defendants. The language in *Geoffrion* is pertinent (336 Mass. at 537, 146 N.E.2d at 656): "Upon discovery of the fraud the plaintiff could have repudiated the contract or could affirm it and bring an action for damages. Forman v. Hamilburg, 1939, 300 Mass. 138, 142, 14 N.E.2d 137." See Exchange Realty Co. v. Bines, 1938, 302 Mass. 93, 97, 18 N.E.2d 425, in which the court dealt with a case also involving discovery of a misrepresentation before an escrow agent had fulfilled his duties, citing Forman v. Hamilburg, supra. See also Automobile Ins. Co. of Hartford, Conn. v. Barnes-Manley Wet Wash Laundry Co., 10 Cir., 1948, 168 F.2d 381, 384–385 n. 9.