**FS PHOTO INC., Larry G. Settle, and David G. Settle, Plaintiffs,**

v.

**PICTUREVISION INC., Philip G. Garfinkle, Yaacov Ben–Yaacov, Ed Glassmeyer, and Robert Kagle, Defendants.**

No. CIV. A. 99–592–A.

United States District Court, E.D. Virginia, Alexandria Division.

Sept. 24, 1999.

---

William Lewis Stauffer, Jr., Stauffer, Mannix, Rommel, Decker & Dulaney, L.L.C., McLean, VA, Andre G. Bouchard, Bouchard, Friedlander & Maloneyhuss, Wilmington, DE, for Plaintiffs.

Susan Rebbeca Podolsky, Jenner & Block, Washington, DC, Lawrence C. Ashby, Ashby & Geddes, Wilmington, DE, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this federal and state securities fraud case, plaintiffs claim that defendants' fraudulent acts caused plaintiffs to exchange certain shares of Preferred Stock for shares of Common Stock at an artificially low ratio. The matter is now before the Court on defendants' motion to dismiss plaintiffs' claims under Rule 12(b)(6), Fed. R.Civ.P.

### I.[1]

Plaintiff FS Photo, Inc. is a Delaware corporation in dissolution. Plaintiff Larry

---

**1.** The facts recounted here are derived from the complaint and are assumed to be true

G. Settle is the Chairman, Vice President and Secretary of FS Photo. Plaintiff David G. Settle is the President and Treasurer of FS Photo. Both men are also directors of the corporation. Defendant PictureVision, Inc. is a Delaware corporation with its principal place of business in Herndon, Va. PictureVision's business is the design, development and sale of software that enables consumers to store and share photographs through the use of digital technology. At all relevant times, defendants Garfinkle, Ben–Yaacov, Glassmeyer and Kagle were directors of PictureVision; Garfinkle and Ben–Yaacov were also officers of the corporation.

Under an Asset Purchase Agreement and other related agreements dated October 22, 1996, plaintiffs were issued a total of 13,125 shares of PictureVision Series B Preferred Stock in exchange for the rights to digital film imaging software and other assets developed by FS Photo. These shares were placed in escrow pending the transfer of FS Photo's assets to PictureVision. Certain creditors and investors of FS Photo were also issued Series B Preferred Stock, bringing the total stock issued for the assets to 28,500 shares.[2]

Because PictureVision was a young company, and the value of its Common Stock not readily ascertainable, the Series B Preferred Stock carried a liquidation preference of $100 per share plus 6% interest, which holders were entitled to receive upon redemption, and which, in effect, set a floor for the security's value. Holders of these securities had the option to convert their shares of Series B Preferred stock into Common Stock at any time according to a conversion formula specified in Article 4(b)(5)(a) of the Restated Second Certificate of Incorporation ("Second Certificate"). The conversion ratio in the Second Certificate was initially set at 1.00153

shares of Common Stock per 1 share of Series B Preferred Stock, but was subject to adjustment based on the net proceeds PictureVision might receive in subsequent equity financing. Significantly, the ratio would be frozen at 1.00153 to 1 in the event PictureVision were to consummate a Common Stock offering to a bona fide third party not affiliated with PictureVision in which the aggregate net proceeds exceeded $2,850,000, and the net proceeds per common share exceeded the initial conversion price of $84.96.

On November 7, 1996, two weeks after the execution of the Asset Purchase Agreement, PictureVision entered into a joint venture with Plaza Create, a Japanese photo finisher. Thereafter, PictureVision issued Common Stock to Plaza Create in a transaction deceptively structured to appear to satisfy the requirements for the freezing of the conversion ratio for Series B Preferred Stock to Common Stock when, in fact, it did not. First, Plaza Create was not a bona fide third party, but was instead a related party. Second, the transaction did not generate proceeds greater than the conversion price because the number of shares issued to Plaza Create was not fixed, but instead was subject to adjustment based on the value placed on the Common Stock in a subsequent equity financing.

Less than two months after the execution of the Asset Purchase Agreement, plaintiffs and defendants became embroiled in a lawsuit with Commix SP, Inc., a creditor of FS Photo, which challenged as fraudulent the transfer of FS Photo's assets to PictureVision. As a result of the Commix lawsuit, plaintiffs' shares of Series B Preferred Stock remained in escrow. The Asset Purchase Agreement required the *unencumbered* transfer of assets and

---

solely for the purpose of disposing of the Rule 12 dismissal motion at bar. *See Martin Marietta Corp. v. International Telecom. Satellite Org.*, 991 F.2d 94, 97 (4th Cir.1992).

2. As of December 31, 1997, Garfinkle and Ben–Yaacov owned 65% of PictureVision's common stock, but none of its Series B Preferred Stock; Kagle and Glassmeyer owned 86% of its Series A Preferred Stock, but none of its Series B Preferred Stock.

the lawsuit constituted an encumbrance that precluded the release of the shares from escrow.

In January and early February 1998, David Settle (for FS Photo) and Garfinkle (for PictureVision) negotiated a settlement of the disputes between plaintiffs and defendants relating to FS Photo's inability to transfer its unencumbered assets to PictureVision as required by the Asset Purchase Agreement. In the course of negotiating the settlement agreement, Garfinkle asked plaintiffs to convert their Series B Preferred Stock into Common Stock at the 1 to 1.00153 ratio he claimed had become frozen as a result of the Plaza Create Transaction. On February 6, 1999, plaintiffs' counsel requested an opportunity to conduct due diligence to determine the value of the Common Stock and to assess whether the conversion of the Preferred Stock into Common Stock at the allegedly frozen ratio made economic sense. Garfinkle refused the request. Over the weekend of February 7–8, 1998, Garfinkle represented to plaintiffs (i) that if PictureVision were to obtain venture capital, it could do so based on a valuation of the company at $60–70 million, (ii) that in the event of a strategic financing, PictureVision's valuation would be closer to $100 million, but (iii) that no such transactions were about to take place. Indeed, Garfinkle told plaintiffs that "nothing was going on" at PictureVision, that the company was "clean as a whistle," and that a financing might be undertaken "down the road." Relying on these representations, plaintiffs, on February 9, 1998, entered into a Settlement Agreement with the defendants under which (i) defendants agreed not to sue plaintiffs for their failure to comply with the terms of the Asset

Purchase Agreement, and (ii) plaintiffs agreed to convert all of their shares of Series B Preferred Stock into Common Stock at the ratio of 1.00153 shares of Common Stock for 1 share of Preferred Stock.

In the Settlement Agreement, plaintiffs also agreed to release defendants "from any and all claims ... including but not limited to any Claims relating to or arising out of the Asset Purchase Agreement ... and the Escrow Agreements," except for an express "carve out" provision, which stated that the release was not intended to limit the rights of plaintiffs with respect to any of their Preferred Stock and/or Common Stock, nor was it to limit any of defendants' duties relating to plaintiffs' Preferred Stock and/or Common Stock.[3] The Agreement also contained a merger clause stating that the Settlement Agreement "contains the entire understanding between the parties .... Except as otherwise provided herein, this Settlement Agreement supersedes any and all prior or contemporaneous agreements, representations and understandings ...."[4]

Unbeknownst to plaintiffs, on the same day the Settlement Agreement was signed, February 9, 1998, PictureVision entered into the "Kodak Strategic Alliance," a $50 million transaction with Eastman Kodak Company in which Kodak agreed to purchase 51% of PictureVision's equity and conduct the business of a consumer imaging network exclusively through PictureVision for a minimum of four years. The package of information PictureVision sent to its stockholders a few days later regarding the transaction revealed (i) that the Kodak transaction valued PictureVision's Common Stock at only $53.4487 (or rough-

**3.** The release states:
This release is not intended to, and shall not, limit, restrict or release: (a) any rights of FS Photo, Lsettle, Dsettle, or any FS Photo shareholder with respect to the Preferred Stock and/or Common Stock of PictureVision held by FS Photo, Dsettle, Lsettle or any FS Photo shareholder or (b) any duties which PictureVision may have with

respect to the Preferred Stock and/or Common Stock of PictureVision held by FS Photo, Dsettle, Lsettle or any FS Photo shareholder.

**4.** Based on the Settlement Agreement between plaintiffs and PictureVision, plaintiffs were also able to settle the Commix lawsuit.

ly half the liquidation preference for each share of Series B Preferred Stock), (ii) that Kodak was purchasing $25 million of existing stock and infusing $25 million in new capital into PictureVision in exchange for newly issued shares,[5] (iii) that the Plaza Create financing was with a "related party" not a bona fide third party, and did not meet the thresholds necessary to freeze the conversion ratio for the Series B Preferred Stock,[6] and (iv) that, as late as 1997, the directors of PictureVision had approved the award of incentive stock options that valued the Common Stock at only $5 a share.

On these facts, plaintiffs assert five separate claims:

(1) a violation of federal securities law, § 10(b) of the Securities Exchange Act of 1934,[7] and Rule 10b–5,[8]

(2) a violation of Virginia securities law,[9]

(3) common law fraud,

(4) breach of contract, and

(5) breach of fiduciary duty.

The standard applicable to a threshold dismissal motion is too well-settled to be disputed. In essence, on a motion to dismiss, the complaint must be construed in the light most favorable to the plaintiff, all facts asserted therein must be taken as true, and dismissal is warranted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *see also Higgins v. Medical College*, 849 F.Supp. 1113, 1117 (E.D.Va.1994).

## II.

Defendants attack plaintiffs' federal securities fraud claim on two grounds, both of which focus on whether the challenged transaction fits within the requirement of the statute: (i) whether the conversion of Preferred Stock into Common Stock was a "purchase or sale" of securities, and (ii) whether defendants' alleged misrepresentations were made "in connection with" the purchase or sale of securities. *See* 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5.

 Liability under Rule 10b–5 attaches only to a "purchase or sale" of securities, a phrase the statute defines expansively; section 3(a)(13) of the 1934 Act states that the "terms 'buy' and 'purchase' each include any contract to buy, purchase or otherwise acquire." *See* 15 U.S.C. § 78c(a)(13). A significant limitation to the phrase's reach is that it applies only to actual buyers and sellers, not to mere offerees. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 755, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). But, in this regard, the Supreme Court has carefully distinguished mere offerees from parties holding actual contractual rights to buy and sell securities, who are purchasers and sellers of securities for the purposes of the 1934 act and Rule 10(b)(5). *See id.* at 749–50, 95 S.Ct. 1917.

Given these principles, there is little doubt that the conversion of plaintiffs' PictureVision stock from Series B Preferred Stock to Common Stock pursuant to the Settlement Agreement is a transaction falling within the statute's "purchase or sale" requirement. Specifically, plaintiffs were holders of contractual rights to buy and sell securities, and as such, the transaction falls squarely within the ambit of the stat-

---

5. Thus, it was only after Kodak acquired a 51% ownership that PictureVision was valued at $100 million.

6. Assuming that the Common Stock valuation by the Kodak Strategic Alliance was accurate, the conversion ratio would have adjusted to 1.59208 shares of Common Stock for each share of Series B Preferred Stock.

7. 15 U.S.C. § 78j(b).

8. 17 C.F.R. § 240.10b–5.

9. Va.Code § 13.1–502.

ute. The Third Circuit reached a similar conclusion when it held that a party with a contractual right to obtain common stock in exchange for the surrender of a convertible debenture had a contract for the "purchase or sale" of securities under the 1934 Act. *See Pittsburgh Terminal Corp. v. Baltimore and Ohio Railroad*, 680 F.2d 933, 938–40 (3rd Cir.1982). *Cf. Dwoskin v. Rollins*, 634 F.2d 285, 289 (5th Cir.1981) (not reaching the issue of whether the conversion of preferred stock to common stock was a purchase or sale of securities, but upholding a directed verdict for defendant on failure to prove scienter).

 There is also little doubt that defendants' alleged misrepresentations were made "in connection with" the transfer or sale of securities. The governing principles in this regard are also well-settled. Misrepresentations that do not pertain to securities themselves cannot give rise to an action under the anti-fraud provisions of the federal securities law. *See Head v. Head*, 759 F.2d 1172, 1175 (4th Cir.1985). Rather, there must be some causal connection between the alleged misrepresentation and the harm incurred when a security is purchased or sold. This statutory requirement exists because "[t]he purpose of § 10b and Rule 10b–5 is to protect persons who are deceived in *securities transactions*—to make sure that buyers of securities are not tricked into parting with something for a price known to the buyer to be inadequate . . . ." *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2nd Cir.1984) (emphasis added). In construing the "in connection with" requirement, courts have carefully distinguished between (1) misrepresentations made in connection with the value of securities or a course of dealings in securities on the one hand, and (2) on the other hand, misrepresentations made in connection with transactions in which a purchase or sale of securities plays an incidental role. *See id.* For example, in *Head v. Head*, the Fourth Circuit found that misrepresentations were not made "in connection with" the pur-

chase or sale of securities when, in the course of property settlement negotiations during divorce proceedings, a husband allegedly made fraudulent misrepresentations as to his net worth by stating the book value of his stock holdings, not the higher fair market value. *See Head*, 759 F.2d at 1172.

 Here, by contrast, defendants' alleged misrepresentations go directly to the value of the stock and to the economic advisability of the transaction. Defendants' assertions that PictureVision would not undertake a future financing and that the Plaza Create transaction operated to freeze the conversion ratio directly affected the rate at which plaintiffs converted their Preferred Stock into Common Stock. Conceivably, the parties might have settled their disputes regardless of the value of the PictureVision Common Stock, but it is clear that plaintiffs likely would not have agreed to convert their Preferred Stock into Common Stock at the 1 to 1.00153 ratio had defendants not misrepresented (i) that the Plaza Create transaction had frozen the conversion ratio, (ii) that the value of the company was $50–60 million, and (iii) that PictureVision was not going to undertake a strategic financing in the near future. Thus, although part of a larger transaction, the misrepresentations were made directly "in connection with" the conversion of the securities themselves. *See SEC v. Drysdale Securities Corp.*, 785 F.2d 38, 43 (2nd Cir.1986) (holding that misrepresentations were "in connection with" the sale or purchase of securities where investors transferred securities to defendant corporation based on misrepresentations as to the *corporation's* financial condition). In other words, plaintiffs engaged in the conversion transaction because of the misrepresentations as to the PictureVision's financial condition, which misrepresentations directly affected the conversion rate and hence the value of the Common Stock acquired. Thus, plaintiffs' allegations adequately describe misrepresentations made "in con-

nection with" the sale or purchase of a security to state a claim under federal securities law. Defendants' challenge to the federal securities fraud claim, in this respect, must fail.[10]

## III.

Defendants attack all of plaintiffs' claims on the ground that they are barred by the Settlement Agreement's merger clause, which states that the Settlement Agreement "supersedes any and all prior or contemporaneous agreements, representations and understandings between the parties." This attack fails as to all claims, although the reasoning with respect to plaintiffs' federal securities fraud claims is different from that applicable to plaintiffs' state law claims.

▮ First, a general merger clause such as the one contained in the Settlement Agreement cannot bar a federal securities fraud claim because the Securities Act itself precludes agreements waiving compliance with the statute's anti-fraud provisions. See 15 U.S.C. § 78cc(a) ("Any condition, stipulation or provision binding any person to waive compliance with any provision of this chapter or any rule or regulation thereunder, or any rule of an exchanged required thereby shall be void."). This provision is a manifestation of Congressional concern that such waiver agreements would severely weaken the Act's remedial power. See Harsco Corp. v. Segui, 91 F.3d 337, 343 (2nd Cir.1996). Consistent with this concern, courts have broadly construed the provision to cover not just explicit waivers, but also contractual provisions stating one party's non-reliance on representations made by an-

other party. See Rogen v. Ilikon Corp., 361 F.2d 260, 267 (1st Cir.1966).[11]

These principles make clear that the Settlement Agreement's merger clause, while not an explicit waiver of compliance with the Securities Act, is nonetheless covered by § 78cc(a) and is thus ineffective to bar plaintiffs' federal securities fraud claims. Significant, too, is that the Settlement Agreement itself contained no representations about PictureVision's financial condition or prospects, and plaintiffs were not given the opportunity to conduct due diligence to determine whether defendants' suggested conversion ratio was appropriate. Thus, unlike a case where a plaintiff is protected from fraud by the presence of specific representations in the agreement or an opportunity to conduct due diligence, plaintiffs in the present case had no protection from securities fraud. See Harsco, 91 F.3d at 342–43 (holding that while an agreement weakened plaintiff's ability to recover under the Securities Act, it did not constitute a forbidden waiver of compliance with the Act because there were detailed representations in the agreement). In this regard, courts have held that enforcement of a general merger clause, like that contained in the Settlement Agreement, to bar federal securities law claims impermissibly weakens a plaintiff's ability to recover under the Act. See, e.g., Burnett v. Physicians' Online, Inc., 1997 WL 470136, 1997 U.S. Dist. LEXIS 12111 at *21 (S.D.N.Y.1997); Folger Adam Co. v. PMI Indus., 1990 U.S. Dist. LEXIS 3349 at *15 (S.D.N.Y.1990). In sum, § 78cc(a) prevents defendants from invoking the Settlement Agreement's merger clause as a bar to plaintiff's federal securities law claims.

---

**10.** Because the language of Virginia Code, § 13.1–502 is essentially similar to its federal counterpart and Rule 10(b)–5, it follows that, for the same reasons, plaintiffs' state securities fraud claim also survives the motion to dismiss.

**11.** In Rogen, the First Circuit disregarded a contractual provision of non-reliance on representations made by the company. The

court, while acknowledging that such a provision was not an explicit waiver of compliance with the securities act, stated that there is "no fundamental difference between saying, for example, 'I waive any rights I might have because of your representations or obligations to make full disclosure,' and 'I am not relying on your representations or obligations to make full disclosure.' " Id.

■ Nor does the merger clause bar plaintiffs' state law claims. Simply put, under Virginia law, "a contractual disclaimer of reliance is not a prophylactic against a claim of fraud." *Hitachi Credit America Corp. v. Signet Bank,* 166 F.3d 614, 630 (4th Cir.1999). A contrary ruling would give effect to a waiver that exists solely because a fraud occurred. A merger clause born of a fraud should not be allowed to immunize the fraudulent conduct; had there been no fraud, there would be no merger clause. Put another way, in a claim for fraud, a party to a contract may point to representations outside of the contract to show that those representations induced the party to enter into the contract, even if the contract itself contains a clause limiting or disclaiming liability for such representations. *See id.* at 630–31 ("A buyer can recover for fraudulent inducement not only where the contract contains a general disclaimer of warranties and liability, but also where the contract contains specific disclaimers that do not cover the allegedly fraudulent contract-inducing representations."). Thus, "while ... contracting parties may waive their contractual rights and disclaim or limit certain liabilities, a false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for recission of the contract . . . ." *George Robberecht Seafood, Inc. v. Maitland Bros. Co.,* 220 Va. 109, 255 S.E.2d 682, 683 (1979) (internal quotation marks omitted).

To be sure, a plaintiff claiming fraudulent inducement to contract typically seeks recission of the contract.[12] Yet, this is not the sole remedy under Virginia law; in a recent case in which a plaintiff asserted both fraud in the inducement and breach of contract, the Fourth Circuit held that "Virginia law recognizes the separate tort of fraud, even where the parties have agreed to a contract, and a plaintiff may recover damages for both fraud and breach of contract." *See Hitachi Credit America Corp.,* 166 F.3d at 628 (internal quotation marks omitted).[13] Although *Hitachi* does not explicitly state that a plaintiff must either affirm the contract and sue for damages or rescind the contract and sue in tort for fraud, the implicit result of *Hitachi* is to allow plaintiffs to sue for fraudulent inducement while they are, at the same time, suing on the contract.

In sum, plaintiffs may maintain fraud claims under Virginia law based on defendants' alleged misrepresentations which occurred prior to the signing of the Settlement Agreement, despite the existence of the merger clause, because plaintiffs are claiming that defendants' misrepresentations fraudulently induced them to enter into the agreement. Accordingly, defendants' motion to dismiss based on the Settlement Agreement's merger clause must be denied.

## IV.

■ The Settlement Agreement's release clause, on which defendants also rely, is no more effective to bar plaintiffs' claims

---

**12.** Relying on *Hall v. Coram Healthcare Corp.,* 157 F.3d 1286 (11th Cir.1998), a case arising under Georgia law, defendants assert that plaintiffs must either seek to rescind the Settlement Agreement and sue for fraud or affirm the contract and retain the benefits of it, in which case the merger clause bars reliance on alleged misrepresentations outside the contract. Defendants' reliance on *Hall* is misplaced; this case is governed by Virginia law, not Georgia law.

**13.** In *Hitachi,* the Fourth Circuit reversed the district court's dismissal of the plaintiff's

fraudulent inducement claim while, at the same time, affirming the district court's grant of summary judgment *for the plaintiff* on plaintiff's claim for breach of a warranty contained in the allegedly fraudulently induced contract. *See id.* The fact that plaintiff was suing on the contract, which contained a merger clause, was irrelevant to the fraudulent inducement claim because the contract did not contain a contractual disclaimer of warranties and liabilities that specifically covered the allegedly fraudulent, contract-inducing representations. *See id.* at 630–31.

than is the merger clause. Like most settlement accords, the Settlement Agreement contains a clause in which plaintiffs agree to release defendants from "any and all claims" arising through the date of the Settlement Agreement, "including but not limited to any Claims relating to or arising out of the Asset Purchase Agreement ... or the Escrow Agreements." Defendants claim that plaintiffs, having entered into a release and settlement of any and all claims, and having received the benefits of a reciprocal release and settlement from the defendants, cannot now bring this action seeking greater consideration than what plaintiffs expressly agreed to in the Settlement Agreement. The flaw in this argument is in the terms of the Settlement Agreement itself, which specifically states that it is not intended to "limit, restrict, or release" any rights of plaintiffs "with respect to the [PictureVision] Preferred Stock and/or Common Stock...held by [plaintiffs]" or any duties which defendants have with respect to the PictureVision stock held by plaintiffs. Defendants argue that this "carve out" provision is "forward-looking," meaning that it was intended to preserve the shareholder rights of plaintiffs holding PictureVision stock *after* the execution of the Settlement Agreement, and as plaintiffs do not allege that defendants have failed to honor any rights or duties with respect to the Common Stock now in plaintiffs' possession, the "carve out" provision cannot exclude plaintiffs' claim from the release.

Defendants' reading of the "carve out" provision of the release clause is unpersuasive; it contradicts the plain language of that provision. As defendants themselves point out, a release, like any other contractual provision, must be interpreted based on its plain and unambiguous language,[14] and the release itself expressly releases only those claims "arising through the date of this Settlement Agreement." Thus, the "carve out" provision is not solely "forward-looking," as defendants argue. If

defendants' interpretation were accepted, the "carve out" provision in the release clause would be meaningless because future claims are explicitly not included within the release. Under Virginia law, courts interpreting a contract must read the contract as a single document and give meaning to every clause where possible. *See Berry v. Klinger,* 225 Va. 201, 300 S.E.2d 792, 796 (1983). The "carve out" provision's plain language is sensibly read to exempt from the release those claims that plaintiffs or other FS Photo shareholders may have as shareholders of PictureVision, as contrasted with other types of related claims, such as claims "relating to or arising out of the Asset Purchase Agreement ... or the Escrow Agreement." This distinction, between the rights plaintiffs have as shareholders of PictureVision and the rights they possess as persons who had prior commercial dealings with PictureVision, is consistent with the plain language of the release clause and gives full meaning to the "carve out" provision.

Defendants respond that this interpretation would swallow the release as a whole, and thus they effectively received no release of value to them in exchange for granting a reciprocal release and Common Stock. Such an argument assumes, however, (i) that plaintiffs had no claims arising out of the Asset Purchase Agreement, Undertaking and Escrow Agreements that were unrelated to their status as shareholders, and (ii) that the release was the primary benefit to defendants from the Settlement Agreement, rather than the conversion of stock, which was apparently necessary to the completion of the transaction with Kodak. Neither of these assumptions is tenable. The plain language of the release clause compels the conclusion that it does not bar plaintiffs' claims.

## V.

 Defendants next assert that plaintiffs' fraud claim fails because plain-

---

14. *See Virginia Impression Prods. Co. v. SCM* *Corp.,* 448 F.2d 262, 265 (4th Cir.1971).

tiffs' cannot demonstrate that they reasonably relied on any allegedly false statement or material omission made by defendants in executing the Settlement Agreement. To state a claim for fraud, a plaintiff must show not only that the defendant made a false statement or material omission, and that plaintiff was harmed thereby, but also that plaintiff reasonably relied on defendant's false statement or omission. *See, e.g., Meridian Title Ins. Co. v. Lilly Homes, Inc.*, 735 F.Supp. 182, 185 (E.D.Va.1990). Under Virginia law, there may be circumstances where reliance cannot be reasonable in the absence of prudent investigation. *See Hitachi Credit America Corp.*, 166 F.3d at 629. Yet, it is also clear that a plaintiff cannot be faulted for failing to conduct a prudent investigation where the claimant was prevented from doing so by a defendant's actions. *See Hoover Universal, Inc. v. Brockway Imco, Inc.*, 809 F.2d 1039, 1044 (4th Cir.1987) ("A buyer who fails to conduct a proper investigation may still recover if the seller's conduct intentionally diverts the buyer from engaging in a reasonable inquiry.").

Here, plaintiffs had no financial or other information regarding the activities of PictureVision and no basis for determining the value of the Common Stock that they were to receive upon conversion of the Preferred Stock except for defendants' representations. Moreover, the Settlement Agreement itself contained no representations regarding any of these matters. At least part of the reason plaintiffs had so little knowledge regarding PictureVision was attributable to defendants' actions, as defendant Garfinkle refused plaintiffs's request to conduct a reasonable due diligence inquiry. And, defendants' motive for doing so was the Kodak Strategic Alliance, which was contingent on defendants persuading plaintiffs to convert their Preferred Stock to Common Stock at the 1 to

1.00153 ratio. In these circumstances, defendants cannot rely on the reasonable inquiry requirement as a basis for threshold dismissal, as it is settled that a defendant who prevents a plaintiff from making a reasonable inquiry may not benefit from the rule that requires a plaintiff to make such an inquiry in order to establish reasonable reliance. *See Hoover Universal, Inc.*, 809 F.2d at 1044. Whether plaintiffs' failure to investigate was unreasonable in these circumstances is a question of fact that cannot be resolved on a motion to dismiss.

## VI.

 By contrast, plaintiffs' contract claim is subject to threshold disposition. In this claim, plaintiffs assert that defendants breached the covenant of good faith and fair dealing by manipulating the timing of the Settlement Agreement to avoid the upward adjustment of the stock conversion ratio that would have resulted had the transaction with Kodak occurred before the Settlement Agreement was signed. Under Delaware law, an implied covenant of good faith and fair dealing is read into every contract.[15] *See Wilgus v. Salt Pond Investment Co.*, 498 A.2d 151, 159 (Del.Ch.1985). This implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." *Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*, 1998 WL 778359, 1998 Del Ch. LEXIS 200 at *18 (Oct. 21, 1998). Thus, a party to a contract may not act with the intention of preventing the other party to the contract from receiving what he or she bargained for under the contract.

 The ratio at which plaintiffs converted their Series B Preferred Stock into PictureVision Common Stock, was the precise ratio stated in PictureVision's Second

---

15. Section 19 of the Settlement Agreement states that it shall be construed in accordance with Delaware law.

Certificate and the Settlement Agreement. Absent any violation of the express terms of the Second Certificate, plaintiffs, citing *Quadrangle,* argue that the implied covenant of good faith and fair dealing obligated defendants to complete the Kodak Strategic Alliance prior to the conversion of plaintiffs' Series B Preferred Stock. This argument fails as it asks too much of a covenant of good faith and fair dealing; such a covenant only prevents one party to a contract from acting to prevent the other party from receiving the bargained-for benefit. Neither the timing of the Kodak Strategic Alliance, nor the highest possible conversion ratio were benefits for which plaintiffs bargained. Defendants had no duty to consummate the transaction with Kodak by any time certain, nor were defendants obligated to act to maximize the conversion ratio for plaintiffs' benefit. Thus, the facts alleged do not state a claim for breach of an implied covenant of good faith and fair dealing.

The distinction between *Quadrangle* and the instant case confirms the soundness of this result. In *Quadrangle,* plaintiffs owned preferred stock, which carried a liquidation preference. The preference was to exist only for a limited time, after which the preferred stock would automatically convert to common stock, which carried no liquidation preference. According to the *Quadrangle* court, it was implicit in the preferred stock's liquidation preference that, in the event the company ceased operating before the conversion date, it would liquidate and pay the preferred shareholders the preference. That did not happen, however, because even though the company ceased operating before the conversion date, it delayed liquidation until after that date to prevent plaintiffs from receiving the preference. The *Quadrangle* court found that defendants' bad faith delay breached the implied covenant of good faith and fair dealing. *See id.* at *19. In contrast, plaintiffs here *voluntarily* agreed to convert their Series B Preferred Stock to Common Stock at the conversion ratio specified in the Settlement Agreement and

the Second Certificate. There was no date in the Settlement Agreement on which plaintiffs' Preferred Stock would automatically convert to Common Stock. And there was no deliberate delay on the part of defendants in completing the transaction with Kodak to deprive plaintiffs of the benefit of the Settlement Agreement. Rather, it is alleged that defendants' misrepresentations as to whether PictureVision would undertake various transactions caused plaintiffs to agree to the conversion ratio stated in the Settlement Agreement. The duty defendants breached, if any, was not a contractual duty, either express or implied. Thus, plaintiffs' breach of contract claims fails.

## VI.

▉ Finally, defendants assert that plaintiffs cannot state a claim for breach of fiduciary duty because defendants did not owe plaintiffs any fiduciary obligation. It is axiomatic that corporations only owe a fiduciary duty to actual shareholders. *See, e.g., Simons v. Cogan,* 549 A.2d 300, 304 (Del.1988) ("[b]efore a fiduciary duty arises, an existing property right or equitable interest supporting such a duty must exist"). In reliance on this rule, courts have held, for example, that corporations owe no fiduciary duty to stock option holders, *see Powers v. British Vita, P.L.C.,* 969 F.Supp. 4, 5 (S.D.N.Y.1997), or holders of convertible debentures because neither is an actual owner of stock. *See Simons,* 549 A.2d at 304. Yet, corporations do owe a fiduciary duty to the *beneficial* owners of stock. *See Anadarko Petroleum Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171, 1176 (Del.1988). Under the concept of beneficial ownership, legal and equitable ownership are separated and "the equitable or beneficial owner possesses an economic interest in the subject property distinct from legal ownership or control." *Id.*

▉ A reasonable inference to which plaintiffs are entitled at this stage of the litigation is that once the shares of Series

B Preferred Stock were placed in escrow for plaintiffs' benefit pursuant to the Asset Purchase Agreement, plaintiffs had a substantial and continuing beneficial interest in those shares.[16] Plaintiffs were to receive the stock held in escrow outright once certain conditions were met, namely, the unencumbered transfer of FS Photo's assets to defendants. The satisfaction of those conditions was outside the control of both parties; only a third party could prevent the transfer of FS Photo's assets, which is precisely what occurred when Commix filed suit challenging the transfer of FS Photo's assets as fraudulent. Thus, because plaintiffs had agreed to purchase PictureVision stock, they can be distinguished from prospective investors, and because plaintiffs were to receive an equity interest in PictureVision, in the form of Series B Preferred Stock, they can be distinguished from holders of convertible debentures, who are merely creditors of a corporation, and not equity holders. *See Simons*, 549 A.2d at 304. As holders of a beneficial interest in PictureVision stock, plaintiffs were owed a fiduciary duty by defendants. Thus, defendants' motion to dismiss this count of plaintiffs' complaint fails.

## VIII.

In summary, defendants' motion to dismiss plaintiffs' federal and state securities fraud claims, plaintiffs' state law fraud claim, and plaintiffs' claim for breach of fiduciary duty must be denied, while defendants' motion to dismiss plaintiffs' breach of contract claim must be granted.

An appropriate order shall issue.

16. In their complaint, plaintiffs state that the shares of Series B Preferred Stock were issued to them and then placed in an escrow account, as required by the Asset Purchase Agreement, pending transfer of FS Photo's assets to defendants. The original Asset Purchase Agreement is not part of the current record.