COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Ortiz, Frucci and Bernhard
Argued at Fairfax, Virginia

CHERYL LORRAINE FITCH

MEMORANDUM OPINION* BY
v.        Record No. 0163-24-4            JUDGE DANIEL E. ORTIZ
AUGUST 12, 2025

PHANTOM AUTO GROUP, LLC, ET AL.

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Tracy C. Hudson, Judge

Thomas R. Breeden (Thomas R. Breeden, P.C., on briefs), for
appellant.

Douglas E. Bywater (Tate Bywater, on brief), for appellees Phantom
Auto Group, LLC and Waqas J. Butt.

Stephen Domenic Scavuzzo for appellee Humar Ilyas.

(Jibran Muhammad; Somireddy Law Group PLLC, on brief), for
appellee MYS Energy, Inc.

After discovering rust on the frame of her newly bought, heavily used 2006 Toyota

Sequoia, Cheryl Fitch sued the dealership where she purchased it, the Virginia state inspector

who had passed the vehicle, and the gas station where the inspection took place. Fitch alleged

fraud and violations of the Virginia Consumer Protection Act ("VCPA"), Code §§ 59.1-196

through -207, against all defendants, breach of warranty against the dealership, and common law

negligence and negligence per se against the inspector and gas station. At the conclusion of the

evidence, the circuit court struck the claims against the gas station entirely, finding that it could

not be vicariously liable for the actions of the inspector because he was an independent

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

contractor. It also struck the common law negligence claims against the inspector and breach of warranty claim against the dealership. The jury was then left to decide whether the dealership and inspector committed fraud and violated the VCPA, and whether the inspector was negligent per se. The jury returned a verdict against Fitch on all but the VCPA claim against the inspector. On appeal, Fitch raises 17 assignments of error, disputing each of the foregoing adverse rulings, the jury verdict, and numerous evidentiary and jury-instruction rulings. Additionally, the inspector, Ilyas, assigns cross-error to the court excluding certain testimony and calculating attorney fees.

Finding no error, we affirm.

## BACKGROUND

### I. Factual Background[1]

In April 2021, Phantom Auto Group, LLC ("Phantom"), a used car dealership in Fredericksburg owned and operated by Waqas Butt,[2] purchased a heavily used 2006 Toyota Sequoia through an online auction. The SUV had over 180,000 miles on it. Upon taking possession, Butt noticed a loud noise coming out of the front end, so, throughout 2021, he had various services performed on the car by Sheehy Toyota in Fredericksburg and a local repair shop, Fix 2 Go. The issue was eventually fixed.

---

[1] The issues raised on appeal require varying standards of review. We accordingly recite the facts here to the extent they are undisputed and go into more detail under the appropriate standards of review in our analysis.

[2] Fitch sued both Phantom and Butt in his individual capacity. The distinction is not relevant to our analysis of this case, and reference to one should be considered a reference to the other.

Comfortable with the vehicle's condition, on October 7, 2021, Butt took the car to get a state inspection at a local Sunoco in Dumfries ("MYS")[3] owned by Mohammad Malik, which he had gone to before. Dealers are required by law to have a vehicle inspected prior to selling it to a customer. State inspectors are licensed and governed by the Virginia State Police,[4] and the properly licensed inspector at this particular MYS location was Humar Ilyas.

During the inspection, Butt did not "go into the garage" or "look to see what [Ilyas] was doing." At the end of the inspection, Ilyas passed the Sequoia. Nothing "pointed out to [Butt] that it may not have been a thorough inspection," and both Butt and Ilyas testified that they had no relationship outside of this routine inspection. Thereafter, Butt listed the car for sale across several online sources.

Cheryl Fitch,[5] a Pennsylvania resident, saw the Sequoia on CarGurus and reached out to Phantom. Fitch has back issues and was searching for a bigger vehicle that would make it easier to load her grandchildren without having to bend over. Fitch had owned "eleven Toyotas" in her life and was aware that they were "known for rusting" and "frame issues."

Fitch and Butt communicated primarily over text. The text messages admitted into evidence show photos of the exterior and conversations about purchase price. Butt also sent Fitch videos "show[ing] the undercarriage of a vehicle" from a "secondary phone number." Fitch testified that these videos showed "the frame being black as if it had been cleaned and

---

[3] The Dumfries Sunoco's parent company is MYS Energy, Inc.

[4] The specific relationship between state inspectors and the VSP is discussed at length in our below analysis.

[5] Throughout the trial proceedings, the parties referred to Fitch by her maiden name of "Cheryl March."

painted and it looked very nice," but the videos were no longer available at trial.[6] Additionally, Fitch received a Carfax report from Butt showing the mileage and extensive service history. Satisfied from the conversations with Butt, Fitch made plans to purchase the Sequoia.

On November 10, 2021, Fitch traveled down to Phantom with her daughter and granddaughter. After they arrived, Butt gave them a tour of the vehicle, gave them a key, and told Fitch to "take [her] time" looking at the vehicle. Fitch looked over the vehicle for about "fifteen minutes" and then took it for an "[a]pproximately twenty minute[]" test drive. Fitch also saw the Virginia safety inspection sticker on the Sequoia. After the test drive, Fitch told Butt she was happy with it; she testified that the Sequoia "handled and felt just like one of my prior Toyotas." At no point during her inspection did Fitch look at the undercarriage of the vehicle. Fitch testified this was because her lumbar issues limited her, and her daughter could not crawl down at 27-weeks pregnant. There is no evidence that Fitch asked Butt to look at the undercarriage or take new videos.

Fitch purchased the Sequoia for $11,500 with a cashier's check. The bill of sale stated in all capital letters, "THIS VEHICLE IS BEING SOLD AS IS." Fitch also received a two-page "Buyers Guide." On the first page, underneath a heading reading, "WARRANTIES FOR THIS VEHICLE," there was a checked box next to large, all-caps type stating, "AS IS - NO DEALER WARRANTY." The second page of the buyers guide read, "Here is a list of some major defects that may occur in used vehicles"; one of the items listed under a "Frame & Body" subheading was "Frame-cracks, corrective welds, or rusted through." Fitch initialed both pages of this guide.

---

[6] Fitch testified that she could view these videos in 2021, but that she could no longer "open[]" or "download" those videos on her phone by the time of trial; there was "an option to download them," but the source "wo[uld'nt]" even allow it." When questioned about this, Butt testified that he did not "do anything to stop her from using the video" and that he no longer had the iPhone on which they were originally recorded.

Now the owner of the Sequoia, Fitch drove it back to Pennsylvania. "After [she] got home," on November 13, Fitch noticed "a little bit of a shake here and there," so she decided "to take it to . . . NTB [Tire]." NTB "did a wheel balancing," "rotated the tires," aligned the wheels, and "mount[ed] and dismount[ed] a tire." NTB also noted "that the tie rods were loose." After the NTB servicing, Fitch felt that the Sequoia "drove very well."

Fitch had no concerns about the car until she took it to get a safety inspection on December 6 so that she could get Pennsylvania tags. Although the Sequoia had passed the Virginia inspection only two months prior, it failed in Pennsylvania. The specific reason is not indicated in the trial record, but, that same day, Fitch texted Butt, "How could you sell me this truck knowing it had a compromised frame?" Butt responded, "[T]here was no frame damage to our knowledge. We sent undercarriage pictures as well if you remember." Fitch testified that, at the time of inspection, the Sequoia's frame was not "painted black" like the now-unavailable undercarriage videos from Butt had shown. After Fitch demanded a refund, Butt explained that "no dealer[s] offer returns or refunds at all for used cars," but he was "doing a favor" by offering a trade-in. The two never reached a resolution.

Fitch contacted the Virginia Attorney General's office, which gave her "tips on lawyers to contact" and told her to "reach out to the state police because they govern the inspection stations." Fitch also filed a complaint with the "Dealer Board," whose investigation yielded no results. Fitch eventually "got a hold of" the state police and "made an appointment to bring the vehicle down . . . to the inspection station" where it had been inspected prior to sale.

On December 30, Fitch met with Trooper Roy Proctor at the MYS location in Dumfries. Proctor had worked with the state police safety inspection division for "[t]welve years"; his duties included "supervising all inspection stations" in his assigned area. Ilyas was at MYS that day. Proctor told Ilyas he was "working a complaint" and performed a new safety inspection

- 5 -

with both Fitch and Ilyas present. During Proctor's review, Ilyas "put [the car] on a lift," Proctor "used a flashlight to shine it on the frame," and he and Ilyas "saw . . . rusted holes." Proctor took numerous photos during his investigation, which show rust and holes in the undercarriage. Ilyas told Proctor that "sometimes he does not raise the vehicle high enough" to comply with the Virginia State Police Safety Inspection Manual. Proctor ultimately determined that the Sequoia "would fail Virginia inspection" if done properly. Following his investigation, Proctor issued Ilyas "a class three offense," which stays on an inspector's record but results in no suspension. Ilyas did not dispute the citation.

## II. Procedural Background

Fitch brought suit against Phantom, Butt, MYS, and Ilyas in Prince William County Circuit Court. Fitch alleged six counts in her complaint: (1) fraud against all defendants; (2) violations of the Virginia Consumer Protection Act ("VCPA") against all defendants; (3) breach of warranty against Phantom under the federal Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312; (4) negligence against MYS and Ilyas; (5) negligence per se against MYS and Ilyas; and (6) wanton and willful negligence against MYS and Ilyas.

Following the conclusion of evidence at trial, MYS moved to strike all claims against it, arguing it could not be vicariously liable for Ilyas's conduct because he was an "independent contractor" and not an employee. Fitch argued that Ilyas was an "employee" of MYS because both Ilyas and MYS used that word in their testimony and the Virginia Administrative Code requires inspectors to be "employee[s]." The circuit court disagreed with Fitch that this choice of language was determinative in whether Ilyas was an "independent contractor," a legal term of art. Finding that "the evidence in this case is almost unequivocally that Mr. Ilyas was . . . an independent contractor" because "his duties were dictated by the Commonwealth," rather than MYS, the court struck the claims against MYS.

Phantom also moved to strike the claims against it. On the breach of warranty claim, Phantom argued that "there [was] no evidence of [Phantom] making any written statement as to the quality" of the Sequoia, as required by the Magnuson-Moss Act. Fitch argued that the "inspection sticker" applied by Ilyas constituted "an express written warranty" by Phantom. The court again disagreed, finding that "[t]he presence of the inspection sticker only affirms that the vehicle passed inspection. It does not affirm that it should have." The court accordingly struck the written warranty claim. The court denied Phantom's motion as to the fraud claim while partially granting the motion as to the VCPA claim (discussed further *infra*), but it allowed most of the VCPA claim to go forward. Finally, the circuit court sua sponte struck the common law ordinary negligence and willful and wanton negligence claims against Ilyas. The court held that the "source of duty rule" applied; because "there is no common law duty to inspect a vehicle," in the court's estimation, the duty to inspect the vehicle arose "solely by virtue of the contract between Phantom and Mr. Ilyas."

The remaining fraud, VCPA, and negligence per se claims went to the jury.[7] The jury returned a verdict for Phantom and Butt on all counts. It returned a verdict against Ilyas on the VCPA claim only, awarding Fitch damages of $11,500, the full purchase price of the vehicle.

Despite prevailing against Ilyas, Fitch moved to set aside the verdict, arguing that the jury's verdict for Phantom but against Ilyas was internally inconsistent. The circuit court set a hearing both to argue Fitch's motion and to determine attorney fees. The court denied the motion. On attorney fees, after Fitch presented evidence of billing and expert testimony, the court awarded $35,494.19 against Ilyas, plus $2,864.08 in costs, less than half of what Fitch had requested.

---

[7] Fitch raises challenges to numerous jury instructions and evidentiary rulings on appeal. Those are discussed fully in our analysis below.

Fitch timely appealed.[8]

## ANALYSIS

On appeal, Fitch raises 17 assignments of error challenging the jury verdict and the adverse rulings of the circuit court discussed *supra*, and Ilyas raises two assignments of cross-error challenging the court's exclusion of certain testimony and its calculation of attorney fees. The sheer number of assignments in this appeal renders its resolution complicated, but the issues can most easily be divided into the following categories: (1) assignments relating to the claims against Ilyas and MYS; (2) assignments relating to the claims against Phantom and Butts; (3) assignments relating to the court's rulings on jury instructions; (4) assignments relating to the court's evidentiary rulings; and, finally, (5) Ilyas's challenge to the court's attorney fees determination.

For the reasons that follow, we find no error in the rulings of the circuit court and affirm its judgment.

### I. Claims Against Ilyas and MYS

Below, the circuit court granted MYS's motion to strike the claims against it on the grounds that Ilyas was an independent contractor. It also sua sponte struck the common law negligence claims against Ilyas under the "source of duty" rule while allowing the negligence per se claim to go forward.

A defendant "'test[s]' the legal sufficiency" of a plaintiff's evidence by moving to strike, "which, as an issue of law, we review de novo." *Collelo v. Geographic Servs.*, 283 Va. 56, 80 (2012) (McClanahan, J., concurring in part and dissenting in part) (quoting *Supervalu, Inc. v.*

---

[8] Fitch filed her opening brief on May 22, 2024, and MYS filed a motion for an extension of time to file its brief on June 20, 2024. The motion remained outstanding, and MYS eventually filed its brief on March 11, 2025. At oral argument, we effectively denied the motion for an extension by declining to hear MYS pursuant to Rule 5A:26. But because Rule 5A:26 merely precludes a late appellee from participating in oral argument, we considered MYS's brief in our resolution of this appeal.

*Johnson*, 276 Va. 356, 369 (2008)). A motion to strike must not be granted unless "it is 'conclusively apparent that plaintiff has proven no cause of action against defendant.'" *Klein v. Klein*, 49 Va. App. 478, 481 (2007) (quoting *Williams v. Vaughan*, 214 Va. 307, 309 (1973)). "When reviewing a circuit court's decision on a motion to strike, we must 'review the evidence in the light most favorable to the non-moving party.'" *Egan v. Butler*, 290 Va. 62, 73 (2015) (quoting *Kiddell v. Labowitz*, 284 Va. 611, 629 (2012)). In other words, "the non-moving party must be given 'the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'" *Id.* (quoting *Hadeed v. Medic-24, Ltd.*, 237 Va. 277, 281 (1989)).

Here, we affirm both rulings, albeit for a different reason on the latter.

### A. The circuit court did not err in striking the claims against MYS.

Below, MYS moved to strike the claims against it, arguing that it "was not in a position to control or supervise" Ilyas's inspections and therefore that Ilyas was "an independent contractor." The court granted the motion under the doctrine of respondeat superior, finding that, because "[t]he evidence in this case is almost unequivocally that Mr. Ilyas was . . . an independent contractor" rather than an "employee," Ilyas's "actions would not impose vicarious liability on MYS." Fitch argues this was error.[9]

In Virginia, "[a]n employer is liable for the tortious act of his employee if the employee was performing his employer's business and acting within the scope of his employment." *Our Lady of*

---

[9] In addition to challenging the circuit court's ruling on vicarious liability, Fitch also argues on appeal that the court erred because MYS could have been found *directly* liable. During argument on the motion to strike, however, Fitch never offered this "ground for . . . objection." *Lee v. Lee*, 12 Va. App. 512, 515 (1991). Fitch argued only that Ilyas was an "employee," and therefore that MYS was vicariously liable. Accordingly, we find that this argument was not preserved for appellate review and decline to consider it. *See* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling . . . ."); *Murillo-Rodriguez v. Commonwealth*, 279 Va. 64, 79 (2010) (requiring a "specific, contemporaneous objection" to "provide[] the opposing party an opportunity to address the issue" and to "allow the trial court to rule intelligently on the issues presented").

*Peace, Inc. v. Morgan*, 297 Va. 832, 844 (2019) (quoting *Parker v. Carilion Clinic*, 296 Va. 319, 335 (2018)).  But "where an independent contractor is employed to perform a work lawful in itself and not intrinsically dangerous, the company . . . is not liable for the wrongful acts or negligence of such contractor."  *Epperson v. DeJarnette*, 164 Va. 482, 486 (1935); 9B Michie's Jurisprudence, *Independent Contractors* § 12 (2025); *see also Sanchez v. Medicorp Health Sys.*, 270 Va. 299, 304 (2005) ("[T]he doctrine of *respondeat superior* imposes tort liability on an employer for the negligent acts of its employees, *i.e.*, its servants, but not for the negligent acts of an independent contractor."); *McDonald v. Hampton Training Sch. for Nurses*, 254 Va. 79, 81 (1997) (same).  "[W]hat constitutes an employee is a question of law; but, whether the facts bring a person within the law's designation, is usually a question of fact."  *Creative Designs Tattooing Assocs. v. Est. of Parrish*, 56 Va. App. 299, 307 (2010) (quoting *Intermodal Servs., Inc. v. Smith*, 234 Va. 596, 600 (1988)).

Our Supreme Court defines "independent contractor" as

> a person who is employed to do a piece of work without restriction as to the means to be employed, and who employs his own labor and undertakes to do the work according to his own ideas, or in accordance with plans furnished by the person for whom the work is done, to whom the owner looks only for results.

*Ogunde v. Prison Health Servs.*, 274 Va. 55, 60 (2007).  Put differently, "[a]n independent contractor 'prosecutes and directs the work himself, using his own methods to accomplish it.'" *Creative Designs*, 56 Va. App. at 308 (quoting *Davis Bakery, Inc. v. Dozier*, 139 Va. 628, 634 (1924)).  The Supreme Court has further distilled four factors to determine whether a hired individual is an employee or independent contractor: "(1) selection and engagement; (2) payment of compensation; (3) power of dismissal; and (4) power to control the work of the individual." *McDonald*, 254 Va. at 81.  Of particular—or "determinative"—importance is the fourth factor: the power to control.  *Id.*; *see also Creative Designs*, 56 Va. App. at 308 ("The ordinary test is

this: 'Who has the power to control and direct [workers] in the performance of their work?'" (quoting *Epperson*, 164 Va. at 486)). If the employer "has the power to direct the means and methods by which" the work is done, then the worker is an "employee." *Va. Emp. Comm'n v. A.I.M. Corp.*, 225 Va. 338, 347 (1983). But "[i]f the [worker] is free to adopt such means and methods as he chooses to accomplish the result, he is not an employee but an independent contractor." *Id.* Ultimately, however, "[n]o hard and fast rule can be laid down for ascertaining whether the status is one or the other. It must be determined from the facts of the particular case in the light of well settled principles." *Creative Designs*, 56 Va. App. at 308 (quoting *Hann v. Times-Dispatch Pub. Co.*, 166 Va. 102, 105-06 (1936)).

Here, the trial court was correct to strike the claims against MYS because it was "conclusively apparent," under this record,[10] that Ilyas was an independent contractor.

Ilyas's uncontradicted testimony was that MYS "did not give [him] any training," "guidance," or "guidelines." He stated that MYS "owners and managers don't interact with the state inspector because . . . we go by the state police. *They are our bosses*." (Emphasis added). When asked, "Does the owner of [MYS] ever watch you do inspections," Ilyas responded, "No." When asked if MYS ever "spot check[ed]" Ilyas to make sure that he was inspecting "the right way," Ilyas responded, "They have nothing to do with my inspections because . . . I'm working under the police department which is the manual." He later emphasized that the station "cannot interfere in [his] inspections." Even Fitch testified that the Virginia Attorney General's office told her "to reach out to the state police *because they govern the inspection stations*." (Emphasis added).

MYS manager Mohammad Malik's uncontradicted testimony corroborated Ilyas's. Malik testified that he did not control Ilyas's working hours because they are dictated "by the state." *See*

---

[10] We make no broad claims about whether Virginia state inspectors are always independent contractors. We find only that the evidence *in this case* conclusively established that Ilyas was an independent contractor.

*Creative Designs*, 56 Va. App. at 310 ("An additional analytical factor is how hours of work are determined."). Malik went on to state,

> During his job, we have not any authority to go tell inspector do this or this. We can provide him the equipment. If we have a problem, we inform the state trooper, this is a problem, the inspector is not doing a proper job or he's coming late or he needs to go early, we inform them. We cannot instruct him about his work. We only tell the state trooper because he's under the state trooper.

For that reason, "only the state" was responsible for any "disciplinary action" that could be imposed on Ilyas. Finally, when asked directly by the court if Ilyas had any other responsibilities at the MYS station, Malik responded, "He's inspector, he's not doing anything else," except occasionally filling in if "the cashier goes to the bathroom."

Taken together, this uncontradicted testimony conclusively demonstrates that Ilyas "prosecute[d] and direct[ed] the work himself, using his own methods to accomplish it," *Creative Designs*, 56 Va. App. at 308 (quoting *Davis Bakery, Inc.*, 139 Va. at 634), and that MYS did not control his work.

On brief, Fitch raises several counterarguments. First, she argues that, because MYS and Ilyas referred to Ilyas as an "employee" during their testimony, that term was legally binding on the court. But "[w]hat constitutes an employee is a question of law," *Id.* at 307, and "issues of law are the province of the courts," *Jones v. Commonwealth*, 42 Va. App. 142, 147 (2004). As the circuit court acknowledged, "[i]n common parlance, individuals don't draw the distinction between an employee and an independent contractor." Ilyas and MYS's choice of terminology did not alter the question of whether Ilyas satisfied the legal criteria to be an "employee" for the purposes of respondeat superior.

Second, Fitch argues that Ilyas was an employee because he "was not free to do whatever inspection he wanted to do, but instead was required to follow the criteria set forth by the [state police], which was thus a condition of his employment as an inspector for MYS." Fitch argues that

- 12 -

the inquiry focuses "not on whether the employer has the right of control, but on whether the employee has the ability to control what they do." But this is a plain misstatement of the law. Our caselaw is unequivocal that the control factor turns on the *employer's* ability to control the "means and method of performing the work." *McDonald*, 254 Va. at 81; *see id.* ("[T]he test is whether the *employer* has the power to exercise such control." (emphasis added)). As already demonstrated, MYS did not dictate how Ilyas was to do his job.

Finally, Fitch points out that MYS "provided the facilities and equipment for the inspection." Although Fitch is correct that an "employer . . . suppl[ying] the instrumentalities [and] tools" does support "employee" status, recall that the control factor is "determinative." *Id.* In this case, in the complete absence of evidence showing that MYS controlled Ilyas's work, the fact that MYS provided a workspace and tools for him to perform his work independently is legally insufficient to establish that Ilyas was an employee.

In sum, because the evidence in this case demonstrated conclusively that MYS exercised no control over Ilyas's work, which was governed entirely by the Virginia State Police, Ilyas was an independent contractor. Accordingly, it was "conclusively apparent that [Fitch] ha[d] proven no cause of action against [MYS]," *Klein*, 49 Va. App. at 481 (quoting *Williams*, 214 Va. at 309), and the circuit court did not err in granting MYS's motion to strike.

B. Assuming it was error for the circuit court to strike Fitch's common law negligence claims, any error was harmless.

Following the conclusion of the parties' cases, the circuit court sua sponte struck Fitch's ordinary and wanton and willful negligence claims under the source of duty rule; the court left her negligence per se claim intact. The court reasoned that "[t]he inspection of the vehicle arose solely by virtue of the contract between Phantom Auto and Mr. Ilyas" and "there is no common law duty to inspect a vehicle." Fitch objected, arguing that Ilyas had a "statutory duty under the Virginia Administrative Code for [him] to perform the inspections in a certain fashion." The court agreed

- 13 -

insofar as the regulations could support a negligence per se claim, but it declined to find that the regulations established a duty supporting common law negligence.

On appeal, Fitch argues the court erred because motor vehicle safety inspectors, under the inspection regulations, owe a general duty to any "subsequent consumer" who "would foreseeably purchase" a vehicle that they had inspected. Fitch cites to no Virginia caselaw supporting such a duty, instead citing to *Buszta v. Southern*, 232 A.2d 396 (R.I. 1967), in which the Rhode Island Supreme Court held that an inspector owed a duty of reasonable care to third parties in an action to recover for personal injury caused by mechanical failures in a car he had inspected.

Here, we need not determine whether Ilyas owed the broad duty asserted by Fitch because we hold that, even assuming the circuit court erred in striking the common law negligence claims, any error was harmless. *See* Code § 8.01-678.

Below, the parties stipulated that, if "the jury reached a verdict against Defendant Humar Ilyas on Count 2 [VCPA], the jury did not need to address Count 5 (negligence per se)." By declining to ask the jury for additional relief if it found for her on the VCPA, Fitch conceded that the relief sought from the two causes of action was overlapping. And, in so doing, Fitch also conceded overlapping relief stemming from the VCPA violations and any common law negligence. Although negligence per se is a distinct cause of action, it is "derivative of common law simple negligence" and "only exists 'where there is a common law cause of action.'" *Virk v. Clemens*, 81 Va. App. 632, 659 (2024) (quoting *A.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 630 (2019)); *see id.* ("[T]he negligence per se 'doctrine does not *create* a duty of care' but 'merely sets a standard of care by which the defendant may be judged in the common-law action.'" (alteration in original) (quoting *A.H.*, 297 Va. at 631)).

Here, the jury found actual damages for Ilyas's violation of the VCPA in the amount of $11,500, therefore, per the parties' stipulation, it did not consider whether he breached his common

law duties in the negligence per se action. Since Fitch conceded no difference in damages between the VCPA violations and negligence per se—and thus no difference in damages between the VCPA violations and the underlying common law cause of action—we hold that any error in striking the ordinary negligence claim against Ilyas was harmless.

With respect to the common law willful and wanton negligence claim, unlike ordinary negligence, this cause of action would have opened the door for the jury to consider additional, punitive damages. *See Green v. Ingram*, 269 Va. 281, 291-92 (2005). But the jury here was specifically instructed to answer whether Ilyas's conduct was "willful" in its evaluation of the VCPA claim, and the jury found that he did *not* act willfully. As we have noted, Fitch alleged that the same underlying conduct gave rise to each of her VCPA and common law negligence claims. Thus, even if willful and wanton negligence had gone to the jury, because the jury found that Ilyas did *not* willfully misrepresent his inspection of the vehicle, it would have been legally inconsistent for it to then find that the same conduct *was* willful in the context breaching any duty to Fitch. We accordingly find that any error in striking the willful and wanton negligence claim was also harmless, and we affirm the circuit court's ruling.

## II. Claims Against Phantom and Butts

The circuit court granted Phantom's motion to strike the breach of warranty claim and partially granted its motion to strike the VCPA claim. The court also denied Fitch's motion to set aside the jury verdict, finding that the verdict was not legally inconsistent. We affirm each of these rulings.

A.  The circuit court did not err in striking the breach of warranty claim against Phantom.[11]

Count III of Fitch's complaint was "Breach of Warranty" under the federal Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312.  Fitch alleged that Phantom created an "express" warranty by (1) "sending videos and photographs" of the vehicle to Fitch, and (2) getting a state inspection and sticker, thereby representing that "the vehicle was capable of passing a Virginia state safety inspection."  The circuit court granted Phantom's motion to strike, finding as a matter of law that "[t]he presence of the inspection sticker only affirms that the vehicle passed inspection.  It does not affirm that it should have."  The court did not address Fitch's second express warranty allegation, which Fitch specifically noted in her objection.

15 U.S.C. § 2310(d)(1) provides relief for a consumer "who is damaged by the failure of a supplier [or] warrantor . . . to comply with any obligation under . . . a written warranty."  A "written warranty" is defined in part as a "written affirmation of fact or written promise . . . or any undertaking in writing . . . which . . . becomes part of the basis of the bargain between a supplier and a buyer."  15 U.S.C. § 2301(6)(A)-(B).  Fitch asserts that "[e]xpress warranties under the [federal] act are defined by the UCC."  Under the Virginia Uniform Commercial Code ("VUCC"), an express warranty can be "[a]ny affirmation of fact or promise," or "[a]ny description of the goods which is made part of the basis of the bargain," Code § 8.2-313(1)(a), (b) (emphases added); the warranty need not be written.  But the term "express warranty" appears nowhere in the federal act, which provides relief only for breach of "*written*" warranties.[12]  15 U.S.C. §§ 2301(6), 2310(d)(1) (emphasis added).  Thus, to the extent Fitch sought to prove an "express" warranty under the

---

[11] We apply the same standard of reviewing a motion to strike articulated *supra*.

[12] The federal act also provides a remedy for breach of "implied warranties," not at issue here.  15 U.S.C. § 2310(d)(1).

- 16 -

Magnuson-Moss Act, she was required to demonstrate that it was "a *written* affirmation of fact" or an "undertaking in writing."[13]  15 U.S.C. § 2301(6)(A)-(B).

Beginning with Fitch's argument that the photos and videos sent by Phantom were an express warranty under the Magnuson-Moss Act, to the extent the images represented an affirmation by Phantom, such affirmation clearly was not "written."  15 U.S.C. § 2310(d)(1); *cf. Gordon v. Nat'l Seating & Mobility, Inc.*, 2021 U.S. Dist. LEXIS 37143, at *8 (N.D. Ga. Mar. 1, 2021) (finding that a video did not constitute a "written warranty" under 15 U.S.C. § 2308(a) when there was "no allegation that the video contains text").  Thus, the circuit court did not err in granting Phantom's motion on that ground.

Turning to Fitch's next argument, the circuit court found that an inspection sticker affirmed merely "that the vehicle passed inspection"; Fitch has consistently maintained that the inspection sticker was an affirmation *by Phantom* that the vehicle "was *capable* of passing such inspection." (Emphasis added).  "The issue whether a particular affirmation of fact made by the seller constitutes an express warranty is generally a question of fact."  *Bayliner Marine Corp. v. Crow*, 257 Va. 121, 127 (1999).  Thus, for the circuit court to have properly struck this claim, it must have been

---

[13] As support for her argument that the UCC's definition governs, Fitch notes that the "legislative history" for the Magnuson-Moss Act states: "Warranties are currently governed by common law and the Uniform Commercial Code . . . .  In the jurisdictions where [the UCC] is in effect, it generally controls the rights of parties in commercial transactions, and it is commonly accepted as today's law of sales."  (Op. Br. 25 (quoting *MacKenzie v. Chrysler Corp.*, 607 F.2d 1162, 1166 (5th Cir. 1979))).  Fitch's argument fails for two reasons.  First, "the plain meaning of a statute cannot be affected by resort to its legislative history."  *Portsmouth v. Chesapeake*, 205 Va. 259, 269 (1964).  Here, the Act establishes relief only for an express "written" warranty; this plain text is narrower than the UCC, and this Court cannot rely on legislative history to broaden its scope.  Second, even if we did consider the legislative history, the statement Fitch relies on is specifically acknowledging the fact that litigants may have to "resort to *state law*" because the Act is not meant to "invalidate or restrict any right or remedy of any consumer under State law."  *MacKenzie*, 607 F.2d at 1166 (quoting 15 U.S.C. § 2311(b)(1)).  In other words, the Act specifically contemplates that litigants will have to look outside the Act, to state law, to fully vindicate their rights in commercial transactions—it does *not* incorporate the UCC into its terms, and Fitch's attempt to rework her federal claim under state law is unavailing.

"conclusively apparent" that the inspection sticker did not constitute a "written affirmation" by Phantom that the vehicle was capable of passing inspection. *Klein*, 49 Va. App. at 481 (quoting *Williams*, 214 Va. at 309); 15 U.S.C. § 2301(6).

Recall that the Magnuson-Moss Act defines "written warranty" in part as a "written affirmation of fact," 15 U.S.C. § 2301(6)(A), but neither the Magnuson-Moss Act nor the VUCC define "affirmation." "In interpreting [a] statute, 'courts apply the plain meaning . . . unless the terms are ambiguous or applying the plain language would lead to an absurd result.'" *Miller & Rhoads Bldg., L.L.C. v. City of Richmond*, 292 Va. 537, 541 (2016) (alterations in original) (quoting *Baker v. Commonwealth*, 284 Va. 572, 576 (2012)). And, "[i]n ascertaining such meaning, dictionary definitions . . . may be consulted." *Green v. Commonwealth*, 72 Va. App. 193, 203 (2020). Although the word "affirmation" can carry a solemn legal significance in certain contexts, *e.g.*, *Affirmation*, *Black's Law Dictionary* (11th ed. 2019) ("A solemn pledge equivalent to an oath . . . ."), in common speech, "affirmation" refers simply to "the act of affirming," *Affirmation*, *Webster's Third New International Dictionary* (2002). To "affirm" means to "validate, confirm," or to "state positively." *Affirm*, *Webster's*, *supra*. So, giving 15 U.S.C. § 2301(6)(A) its plain reading, a "written affirmation" is simply a validation, confirmation, or positive statement that is in writing.

Applying that interpretation, the question is whether the inspection sticker on the Toyota Sequoia constituted an affirmation—a written validation, confirmation, or positive statement— by Phantom that the vehicle in fact satisfied inspection requirements. We find that it did not.

At the outset, we note that it is unclear that the inspection sticker was an "affirmation" *by Phantom* at all. It was Ilyas who placed the sticker on the Sequoia and affirmed that the vehicle was in condition sufficient to pass inspection under the Virginia State Police manual. As discussed earlier, Ilyas was licensed by the state police and was the party responsible for ensuring compliance with a lengthy, government-issued manual. In that sense, an inspection

- 18 -

sticker constitutes a statement from a licensed agent of the Commonwealth that the vehicle complies with state regulations. But Phantom had nothing to do with either ensuring such compliance, or even with placing the inspection sticker on the vehicle. And Phantom certainly did not speak for the Commonwealth when it presented the Sequoia—with an inspection sticker affixed—to Fitch. Thus, we find that Fitch's argument fails at the doorstep because, regardless of what the sticker communicated, it was not an "affirmation" *by Phantom* at all.

But, even assuming that the sticker was an "affirmation" by Phantom, the circuit court was correct that Phantom merely warranted that the Sequoia passed inspection, not that it was "capable" of passing inspection. First, again, Phantom was not licensed by the Virginia State Police to conduct inspections under the safety inspection manual. To the extent Phantom affirmed anything, it affirmed only that the vehicle was passed by a licensed inspector, not that it was qualified to perform the inspection itself or qualified to second-guess the inspector.

Second, Code § 46.2-1539, governing dealer inspection requirements, supports the conclusion that the inspection sticker was not a "written affirmation" by Phantom as to the validity of Ilyas's inspection. Section 46.2-1539 requires that, "between the time [a] vehicle comes into the possession of the dealer and the time it is sold at retail," the vehicle "is inspected by an official safety inspection station." In other words, rather than requiring that a dealer perform any kind of inspection itself, the Code requires only that a vehicle "is inspected" at "an official safety inspection station," which Phantom was not. A dealer is required to take further action only "[*i*]*n the event* the vehicle is found to not be in compliance." Code § 46.2-1539 (emphasis added). And, even then, the dealer need only "take steps to bring it into compliance" or "furnish . . . a written disclosure" to the buyer; it need not perform any kind of inspection itself. If this Court held that an inspection sticker constitutes an express warranty *by the dealer* that a vehicle *in fact* met inspection requirements, it would create dissonance with § 46.2-1539's

language requiring merely that a vehicle "is inspected." Dealers would have to go beyond the language of the statute and actively double-check the work of the inspector, even if the vehicle had passed, something dealers like Phantom are not qualified to do.[14] The circuit court's approach was far more rational, and we accordingly affirm its judgment.

B. The circuit court did not err in striking a portion of the VCPA claims against Phantom.

Below, Phantom moved to strike the VCPA claim against it; the circuit court granted the motion only as to Code § 59.1-200(A)(7), which prohibits

> [a]dvertising or offering for sale goods that are used, secondhand, repossessed, defective, blemished, deteriorated, or reconditioned, or that are "seconds," irregulars, imperfects, or "not first class," without clearly and unequivocally indicating in the advertisement or offer for sale that the goods are used, secondhand, repossessed, defective, blemished, deteriorated, reconditioned, or are "seconds," irregulars, imperfects, or "not first class."

The circuit court noted that Phantom "told [Fitch] it was a used vehicle" and therefore found that subsection (A)(7) was inapposite. Fitch argues that, because subsection (A)(7) includes some eleven adjectives, the court erred by only considering whether Phantom told Fitch the car was "used." Fitch's argument misses the court's point.

As Phantom points out on brief, Fitch not only knew that the vehicle was used, she also received a "Buyer's Guide" from Phantom as part of the sale that listed dozens of "major defects that may occur in used vehicles." Specifically listed under a "Frame & Body" subheading were "[f]rame-cracks, corrective welds, or rusted through." Fitch testified that she remembered receiving and initialing this document. Phantom thus "indicat[ed]" to Fitch—and Fitch acknowledged—not

---

[14] We emphasize that our holding is limited to the facts of this case—Butt testified that Phantom was a one-man operation and, because he did not "do repairs onsite," he had to take vehicles outside of the dealership to be inspected. We offer no opinion on dealers who offer repairs or inspections on-site.

only that the Sequioa would be "used," but that it could be "defective," "blemished," or "deteriorated" as well.

The intent of the General Assembly in enacting Code § 59.1-200(A)(7) was clearly to avoid suppliers passing off used goods as new, like new, or "first class." The circuit court in this case correctly determined that it was "conclusively apparent" from the record that Phantom provided ample "indicat[ion]" to Fitch that the vehicle may have defects and thus did not violate subsection (A)(7). *Klein*, 49 Va. App. at 481 (quoting *Williams*, 214 Va. at 309). We accordingly affirm its motion to strike that portion of the VCPA claim against Phantom.

C. The circuit court did not err in denying Fitch's motion to set aside the jury verdict.

Following trial, Fitch moved to set aside the verdict on the ground that the jury's findings were "internally inconsistent." Fitch argued that the jury could not have found that "Ilyas had misrepresented that the vehicle had a proper motor vehicle safety inspection" while also finding that Phantom did not "misrepresent[] that the vehicle was capable of passing a safety inspection," and thereby violate the VCPA.

"When considering whether a circuit court erred in declining to . . . set aside the verdict, we apply the following standard of review: 'whether the evidence presented, taken in the light most favorable to the [nonmoving party], was sufficient to support the jury verdict in favor of the [nonmoving party].'" *Isle of Wright Cnty. v. Nogiec*, 281 Va. 140, 147 (2011) (quoting *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154 (2009)). "A trial court is authorized to set aside a jury verdict only if it is plainly wrong or without credible evidence to support it." *21st Century Sys. v. Perot Sys. Gov't Servs.*, 284 Va. 32, 41 (2012).

In relevant part, the VCPA declares unlawful: "Misrepresenting the source, sponsorship, approval, or certification of goods or services"; "Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits"; "Misrepresenting that goods or services

are of a particular standard, quality, grade, style, or model"; "Misrepresenting that repairs, alterations, modifications, or services have been performed or parts installed"; and "Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Code § 59.1-200(2), (5), (6), (10), (14). At argument on the motion to strike, the circuit court found that

> there were reasons that the jury could find against the inspector, I mean because he admitted to the trooper that he didn't look at the frame of that vehicle, and then I think that the jury could have rejected the VCPA claim against the dealer because they could have concluded that the presence of the sticker was not in fact a representation about the condition of the vehicle.

The circuit court was correct that there was sufficient evidence for the jury to find that Phantom did not engage in any of the above-listed misrepresentations in Code § 59.1-200.

First, Fitch's assignment assumes the entire warranty argument discussed *supra*. As we have already held, the inspection sticker in this case was not a representation by Phantom that the Sequoia was capable of passing inspection; if anything, it affirmed merely that the vehicle passed inspection.

Additionally, viewed in the light most favorable to Phantom, the evidence supported a finding that Phantom trusted the reliability of the inspection sticker as much as Fitch and sold her the vehicle in good faith. Butt testified that he "wasn't . . . aware of any" defects in the vehicle, that he did not "go into the garage" to observe the inspection, and that there was nothing "that pointed out to [him] that it may not have been a thorough inspection." The jury clearly credited Butt's testimony. On the other hand, for the reasons articulated by the circuit court, the evidence also supported a finding that Ilyas *did* misrepresent the "certification" he placed on the vehicle. Code § 59.1-200(2). Accordingly, there was nothing "internally inconsistent" about the jury's findings, and we affirm the circuit court's declining to set aside the verdict.

- 22 -

III. Jury Instructions

Next, Fitch challenges the court's rulings denying four jury instructions, modifying one, and giving another. "We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion." *Conley v. Commonwealth*, 74 Va. App. 658, 675 (2022). In so doing, we look "to see that the law has been clearly stated and that the instructions cover all issues [that] the evidence fairly raises." *Lawlor v. Commonwealth*, 285 Va. 187, 228 (2013) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). This presents "a mixed question of law and fact." *Id.* "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Id.* (quoting *Orthopedic & Sports Physical Therapy Assocs. v. Summit Grp. Props., LLC*, 283 Va. 777, 782 (2012)). But an instruction is proper "'only if supported by the evidence,' and more than a scintilla of evidence is required." *Id.* (quoting *Orbe v. Commonwealth*, 258 Va. 390, 398 (1999)). Further, "[w]hen reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Id.* at 228-29 (quoting *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002)).

We find no abuse of discretion here.

*Modification of Instruction 19*

Fitch's proposed Instruction 19 stated:

> A motor vehicle safety inspector are [sic] required to be certified and licensed by the Department of State Police. When an official inspection station and inspector inspects a motor vehicle for a motor vehicle dealer, the inspector and inspection station are required to put the dealer's name on the rear of the approval or rejection sticker. An official inspection station and inspector must comply with all of the Motor Vehicle Safety Inspection regulations regardless of whether it is a dealer or a private person requesting the inspection. The inspector and inspection station must inspect every vehicle presented for inspection in a manner set forth in the Virginia Motor Vehicle Safety Inspection Manual, and either approve or reject the vehicle. Virginia's Motor Vehicle Inspection Program has a stated purpose that it was developed and adopted to promote highway safety—that is, to protect the public at large.

The circuit court removed the first three sentences of the instruction, such that it was modified in the manner indicated below:

> ~~A motor vehicle safety inspector are required to be certified and licensed by the Department of State Police. When an official inspection station and inspector inspects a motor vehicle for a motor vehicle dealer, the inspector and inspection station are required to put the dealer's name on the rear of the approval or rejection sticker. An official inspection station and inspector must comply with all of the Motor Vehicle Safety Inspection regulations regardless of whether it is a dealer or a private person requesting the inspection.~~ The inspector and inspection station must inspect every vehicle presented for inspection in a manner set forth in the Virginia Motor Vehicle Safety Inspection Manual, and either approve or reject the vehicle. Virginia's Motor Vehicle Inspection Program has a stated purpose that it was developed and adopted to promote highway safety—that is, to protect the public at large.

Fitch argues that the court's modification was error because it removed "the entirety of the interplay [between] the dealership and the inspector"—one of her key arguments below was that Phantom and Ilyas colluded in a "lick and stick" scheme. We disagree that this modification was error.

First, the modified instruction "clearly stated" the relevant legal requirements imposed on inspectors. *See* 19 VAC 30-70-20(A) ("Each official inspection station must inspect every vehicle presented for inspection as prescribed by this chapter, either approving or rejecting it."); 19 VAC 30-70-10.1(A)(4) ("All safety inspectors must . . . agree to . . . carefully inspect every motor vehicle, trailer, and semi-trailer presented for inspection as required by the Official Motor Vehicle Safety Inspection Manual."). Fitch's proposed instruction would have included superfluous technicalities in the Administrative Code that were not in dispute in this case, such as licensure requirements and requirements for inspecting dealer cars. The additional language could have created confusion about which inspection requirements Ilyas failed to meet, such as lifting the vehicle high enough to see the undercarriage. Thus, the court did not err by whittling-down the instruction to only what was necessary for the jury's review.

Second, to the extent Fitch believed that the first part of the instruction was necessary for her to argue that Phantom and Ilyas had a "lick and stick" scheme, the argument is unavailing. Although the Sequoia passed inspection when it should not have, there is no evidence in the record that Phantom and Ilyas colluded in any way. Both Ilyas and Phantom unequivocally denied such a relationship, and Trooper Proctor testified that Ilyas failed to properly inspect the undercarriage of vehicles on more than one occasion—i.e., the issue was not unique to Phantom. Thus, even if the proposed instruction were useful in instructing the jury on that relationship, there was not more than a "scintilla of evidence" that a lick-and-stick scheme occurred, and the court's modification was correct for that reason, as well.

*Refusal to Give Instruction 20*

Proposed Instruction 20 stated, "It is a deceptive act or practice for any used vehicle dealer to misrepresent the mechanical condition of a used vehicle." This was an almost direct quote from the Federal Trade Commission regulations, 16 C.F.R. 455.1(a)(1). The court found this was duplicative of Instruction 21, which articulated the elements of the VCPA claim. Specifically, Instruction 21 asked, in part:

> 1. Did the Defendants:
>
> a. Misrepresent the approval or certification of the vehicle for as capable of passing a safety inspection; or
> b. By claiming that the vehicle was capable of passing a safety inspection, misrepresent that the vehicle had certain characteristics or benefits: or
> c. By claiming that the vehicle was capable of passing a safety inspection, misrepresent that the vehicle was of a particular standard, quality or grade; or
> d. Offer to sell a vehicle that was defective without clearly and unequivocally indicating in the offer for sale that the vehicle was defective; or
> e. Misrepresent that a safety inspection had been properly performed; or
> f. Use any other deception, fraud, false pretense, false promise or misrepresentation. . . .

We find easily that the court did not err.  As Instruction 21 clearly articulated, the issue was whether defendants violated the VCPA—which does not use the term "deceptive practice"—not federal regulations.  Thus, not only was Fitch's proposed Instruction 20 irrelevant, but Instruction 21 also "clearly stated" the requirements of the VCPA, Code § 59.1-200(A), on its own.

### *Refusal to Give Instruction 23*

Proposed Instruction 23 defined the term "willful."  It stated:

> An [sic] statement is "willful" if the speaker represents a fact to be true without knowing whether it is true or not, and with reckless disregard for whether it is true or not.  An unfair or deceptive act is "willful" if the person intends to commit an unfair or deceptive act.  It is not, however, required that the person knows that his actions are violating the Consumer Protection Act.

The word "willful" was used in Instruction 21 on the VCPA and Instruction 46 on fraud, and a finding of "willfulness" would have allowed the jury to either increase damages under the VCPA, Code § 59.1-204, or award punitive damages for fraud.  The court found that proposed Instruction 23 was an "improper comment on the evidence and not a proper statement of the law."

Fitch derived her definition from various federal authorities, but neither the VCPA nor Virginia caselaw define "willful" in the context of the VCPA or fraud.  In the absence of a controlling definition, the circuit court elected for the jury to determine whether the defendants' actions were "willful" based on the plain meaning of the word.  The jury, as fact-finder, was more than capable of accomplishing this task, and we accordingly find no abuse of discretion by the circuit court.

### *Refusal to Give Instruction 58(J)*

Instruction 58 governed the jury's damages determination.  Proposed subsection (J) would have allowed the jury to consider "[a]nnoyance, embarrassment, and humiliation."  Below, the circuit court asked counsel, "What's the evidence to support [the instruction]?"  Counsel argued that Fitch testified that "she's a strong woman" who felt "embarrassed in that she got taken by them,"

and that it was a "self-worth issue." The court rejected this argument, finding "the evidence [does not] support any claim for loss of self-worth."

Fitch is correct that Virginia courts "have approved compensatory damages supported by evidence of non-pecuniary or emotional damages alone." *N. Va. Kitchen, Bath, & Basement, Inc. v. Ellis*, 299 Va. 615, 624 (2021). But the circuit court did not abuse its discretion in finding that the evidence here did not support an instruction on "[a]nnoyance, embarrassment," or "humiliation." Fitch's testimony demonstrated that she was understandably upset by the entire car-buying experience; she stated, "I pride myself as a woman that doesn't get taken advantage of . . . . I really feel taken advantage of." But Fitch did not testify about feelings of humiliation or outward embarrassment. As the court pointed out, "[n]obody was saying, 'Why are you driving around in that piece of junk?' or anything." Thus, reviewing for an abuse of discretion, we cannot say that the court erred in finding that there was not a scintilla of evidence to support proposed Instruction 58(J).

*Refusal to Give Instruction 67*

Proposed Instruction 67 imperfectly parroted Code § 46.2-1539's requirement that a dealer get an inspection performed on a vehicle prior to selling it. Whereas § 46.2-1539 mandates that a dealer "take steps to bring [the vehicle] into compliance" if "the vehicle *is found* not to be in compliance," Fitch's instruction read: "If the car *is not* in compliance with all safety inspection requirements, the dealer shall . . . bring it into compliance." (Emphases added). The court reasoned that this instruction was unnecessary because it was undisputed that Phantom "got a valid sticker" on the Sequoia and therefore satisfied the statutory requirements.

The circuit court was correct that, under a proper reading of Code § 46.2-1539, there was no dispute that Phantom complied with the provision. Fitch's instruction misstated the law in a crucial way. As discussed in our analysis of Fitch's warranty claim *supra*, § 46.2-1539 requires merely that a dealer get a car inspected by a licensed inspector. A dealer must take additional steps only "[*i*]*n*

- 27 -

*the event* that the vehicle *is found*"—by the inspector—"not to be in compliance with all safety inspection requirements." Code § 46.2-1539 (emphasis added). Fitch's instruction would have read this language out of the Code by instructing the jury that a dealer must take action if a vehicle does not *in fact* comply with inspection requirements, regardless of whether the dealer had taken the car to be inspected. Here, as already discussed, Phantom took the car to be inspected and it passed, therefore no further action was required. Thus, the circuit court was correct that Code § 46.2-1539's requirements were not at issue, and, regardless, Fitch's instruction misstated the law.

*Refusal to Give Instruction 68*

Proposed Instruction 68 stated:

> An AS IS disclaimer does not affect a claim for fraud. A Buyer can show that a contract of sale was induced by seller's fraud notwithstanding fact that sale was made "as is," and the same is true even though the written contract contains covenants waiving warranties or disclaiming or limiting liabilities.

The circuit court reasoned that, if it had given this instruction, it would have confused the jury on the fraud claim against Phantom by suggesting that the fact that Fitch signed an as-is disclaimer automatically rendered any reliance "reasonable." We find no error.

To start, the first sentence of the instruction misstates the law. "Absent . . . reasonable or 'justifiable reliance,' no fraud is established." *Murayama 1997 Tr. v. NISC Holdings, LLC*, 284 Va. 234, 246 (2012). The circuit court was correct that the presence of an as-is disclaimer on Fitch's documents was highly relevant to the question of whether her reliance on any alleged misrepresentation by Phantom was reasonable. Thus, instructing the jury that "[a]n AS IS disclaimer does not affect a claim for fraud" would have been misleading.

Further, even considering only the second sentence of the instruction, which was pulled directly from *George Robberecht Seafood, Inc. v. Maitland Bros., Co., Inc.*, 220 Va. 109 (1979), the circuit court did not err. Although this line from *George Robberecht* was a correct statement of law,

the elements of fraud had already been clearly articulated in Instruction 54. The court could have

determined that any further explanation of the law was unnecessary or even that additional

instructions involving warranties, in an already factually complicated case, had potential to muddle

the issues. Accordingly, because the jury had already been accurately instructed on the elements of

fraud, we find no abuse of discretion in the court's refusal to give proposed Instruction 68. *Cf.*

*Howard v. Commonwealth*, 210 Va. 674, 679 (1970) (finding that, where "the record disclose[d]

that other instructions given by the court adequately covered the substance of [a refused]

instruction," "it was not error for the trial judge to refuse it").

*Giving of Instruction K-1*

Finally, Fitch assigns error to the court's giving of Instruction "K-1." It stated:

> A person to whom a misrepresentation was made has no duty
> to investigate unless he had or obtained information about the
> representation which would cause a reasonably prudent person to
> investigate.

> If a person has a duty to investigate a representation and fails
> to investigate to the extent that a reasonably prudent person would,
> then he is bound by all knowledge that such an investigation of that
> representation would have disclosed.

In granting this instruction, the court reasoned that the circumstances surrounding the purchase—

including the 180,000 miles on the Sequoia, the disclaimers, and the fact that Fitch knew about rust

issues in Toyotas—could support a jury finding that Fitch had a duty to investigate.

Instruction K-1 was a fair statement of the doctrine of caveat emptor and its relationship to

fraud in Virginia. Our Supreme Court has stated:

> Where ordinary care and prudence are sufficient for full protection, it
> is the duty of the party to make use of them. Therefore, if false
> representations are made regarding matters of fact, and the means of
> knowledge are at hand and equally available to both parties, and the
> party, instead of resorting to them, sees fit to trust himself in the
> hands of one whose interest it is to mislead him, the law, in general,
> will leave him where he has been placed by his own imprudent
> confidence.

*Va. Nat. Gas v. Hamilton*, 249 Va. 449, 456 (1995) (quoting *Kuczmanski v. Gill*, 255 Va. 367, 369 (1983)). Federal courts interpreting Virginia law and some circuit courts have fleshed out this principle to a more explicit duty to investigate where a reasonably prudent person would.[15] The circuit court's interpretation of the doctrine, as articulated in this instruction, was an accurate distillation of our Supreme Court's precedent and the persuasive authority interpreting it.

Further, the framing of this instruction was likely *helpful* to Fitch. The instruction begins by stating, "A person to whom a misrepresentation was made has no duty to investigate . . . ." It establishes a baseline principle, and only after does it frame the doctrine of caveat emptor as a carve-out to the general rule.

In sum, because there was far more than a "scintilla of evidence" that Fitch may have been aware of potential issues with the Sequoia—given its high mileage, the buyers guide, and Fitch's experience with Toyotas—this instruction was both proper and potentially helpful to Fitch.

## IV. Evidentiary Rulings

Fitch next challenges three of the court's evidentiary rulings, and Ilyas challenges another. "It is well-settled that '[d]ecisions regarding the admissibility of evidence "lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion."'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (alteration in original) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)). "Only when reasonable jurists could not differ can

---

[15] *See, e.g.*, *Jared & Donna Murayama 1997 Tr. v. NISC Holdings, LLC*, 82 Va. Cir. 38, 50 (Fairfax 2011) ("[I]f a party claiming fraud was given information that would arouse the suspicions of an ordinary person, he is under a duty to investigate and cannot reasonably rely on the representations or silence of the other party."); *Hoover Universal, Inc. v. Brockway Imco, Inc.*, 809 F.2d 1039, 1044 (4th Cir. 1987) ("[I]n circumstances where a prudent buyer would have conducted an investigation and, thereby, discovered the seller's misstatement, a buyer who fails to make such an investigation may not assert fraud based on the factual misrepresentation."); *FS Photo, Inc. v. Picturevision, Inc.*, 61 F. Supp. 2d 473, 483 (E.D. Va. 1999) ("Under Virginia law, there may be circumstances where reliance cannot be reasonable in the absence of prudent investigation.").

we say an abuse of discretion has occurred." *Id.* (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

The circuit court did not abuse its discretion in any of its rulings.

*Refusal to Admit Exhibit 20 (Mechanic's Report)*

At trial, Fitch sought to introduce a report under Code § 8.01-416 from a Pennsylvania mechanic, who was not present but supported the report by affidavit, establishing repair costs to the vehicle. Section 8.01-416(A) provides in relevant part, "[i]n a civil action in any court, whether sounding in contract or tort, *to recover for damages to a motor vehicle* . . . evidence as to such damages may be presented by an itemized estimate or appraisal sworn to by . . . a motor vehicle repairman." (Emphasis added). The circuit court sustained Phantom's objection, finding that Fitch's claim was "not a claim for damages to the car" but rather a claim "that the car wasn't as represented."

Fitch argues, first, that § 8.01-416(A)'s reference to "a civil action" means that it broadly applies to "any" civil action, therefore, second, the circuit court erred because repair costs are recoverable damages in a fraud claim. Fitch is correct that repair costs stemming from the misrepresentation of a purchased vehicle would be recoverable, but her reading of the statute is contrary to the plain text.

Section 8.01-416(A) covers "a civil action . . . *to recover for damages to a motor vehicle*." (Emphasis added). Under a plain reading, the provision refers to an action in which the plaintiff's alleged injury by defendants is damage to the vehicle. Here, Fitch does not allege that any of the defendant's caused damage to her SUV; instead, her alleged injury is fraud in the inducement— defendants caused her to purchase an *already* damaged vehicle. In other words, Fitch brought "a civil action . . . to recover for" economic loss stemming from misrepresentation, not to recover for damages caused by the defendants to the vehicle. Accordingly, the circuit court did not abuse its

discretion in holding that Fitch's claim "was not a suit for damage to the car" and subsequently excluding the out-of-court mechanic's affidavit.

*Admitting Testimony on Auction Announcements*

During Butt's direct examination, Butt reviewed the bill of sale from the auction dealer where he purchased the Sequoia. He testified that the only notation under an "announcements and notes" section was that the vehicle was sold "as/is." He further testified that, "normally," the dealer "will definitely make announcements if [the vehicle]'s got frame damage." Fitch objected, arguing Butt's testimony was speculative. The circuit court overruled the objection, and Butt further testified that the dealer will "always" indicate if a vehicle has frame damage.

Fitch's assignment of error is borderline frivolous. Butt testified that he had "twelve years" of experience selling cars and more than five years' experience running his own dealership. The circuit court reasonably concluded—it had no choice but to conclude—that Butt had ample personal experience to testify as to what was typical in auction announcements he had attended. Accordingly, the circuit court did not abuse its discretion.

*Admitting Testimony on Repairs Recommended by Sheehy Toyota*

Recall that, prior to selling the Sequoia to Fitch, Butt had taken it for various service appointments at Sheehy Toyota and Fix 2 Go. During Ilyas's cross-examination of Butt, the following exchange took place:

> Q        So likewise with the previous exhibit, did you repair [the vehicle] based upon Sheehy's recommendations?
>
> A        This was actually not even necessary because when I got the car back from Sheehy, I took it to Fix 2 Go [a repair shop]. I told them look, there's five items, I know that one of them says timing belt, I know it's not broken, so could you just go over on the items that actually need some real attention.

Fitch objected to "any indication of what Fix 2 Go may or may not have told him."

- 32 -

Fitch's argument that there was somehow an implied statement by Fix 2 Go in Butt's testimony simply does not obtain. Butt testified, "*I* told them," "*I* know that," and "*I* know it's not broken." (Emphases added). The circuit court did not abuse its discretion.

*Refusal to Admit Testimony by an NTB Employee*

Finally, as his first assignment of cross-error, Ilyas asserts that the circuit court erred by excluding testimony from an NTB employee, who would have testified regarding the NTB service report from when Fitch took it in on November 13, 2021; the witness was not present at the service appointment and would have been testifying as a representative for NTB. Ilyas proffered that the employee would have testified that, even though the NTB repair was for tie rods, NTB would have noticed and indicated frame damage in the report. The court excluded the employee's testimony as speculative. The court found that, because the underlying document would be inadmissible under the business records exception, any testimony by the employee—who was not actually present at the service appointment—would be speculative.

The circuit court was correct. Virginia Rule of Evidence 2:803(6), "Records of a Regular Conducted Activity," excepts certain documents from the hearsay rule if, in part, the offering party introduces them with a "custodian" qualified under Virginia Rule of Evidence 2:902(6). Here, Ilyas's counsel specifically conceded that the employee was not a records custodian, stating, "Is he a records custodian, no." And it is undisputed that the NTB employee was not actually present at the November 13 service appointment. There was thus no foundation for the invoice, and the court did not abuse its discretion in finding that the employee's testimony about what NTB might have found on November 13 was speculative.

V. Attorney Fees

Ilyas's other assignment of cross-error is that "[t]he Circuit Court erred when it permitted paralegal time to be awarded at the rate of $275 per hour when there was no evidence that such rate was reasonable under the facts and circumstances of this case."

This Court reviews "an award of attorney's fees for abuse of discretion." *Lambert v. Sea Oats Condo. Ass'n*, 293 Va. 245, 252 (2017). A court abuses its discretion "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." *Id.* (quoting *Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 429 (2012)).

Here, Ilyas does not point to any "improper" consideration by the circuit court. In his sworn declaration, counsel for Fitch stated that his paralegal "has a standard hourly billing rate of $275.00." And, in a separate hearing on attorney fees following trial, Fitch introduced an expert who testified that the fees in this case, including the paralegal fees, were "reasonable." Concerning the paralegal specifically, the court held

> I don't think there's any merit to complaining about the time devoted
> by the paralegal. Those are tasks that certainly could have been done
> by Mr. Breeden at twice or nearly twice the hourly rate, so in fact,
> use of a paralegal where appropriate I think saves money on the cost
> of the case.

In sum, not only did Fitch introduce uncontradicted testimony that her fees were reasonable, but the court specifically considered the paralegal fees and found that they were actually helpful to Ilyas. Accordingly, the court did not abuse its discretion in its award of attorney fees.

CONCLUSION

For the foregoing reasons, the judgments of the circuit court are affirmed.

*Affirmed.*